1
2
3
4
5
6                           UNITED STATES DISTRICT COURT
7                                  DISTRICT OF NEVADA
8                                          * * *
9    FRANCIS J. PULLANO,                       Case No. 2:10-cv-00335-MMD-VCF
10                             Plaintiff,
                                               ORDER
11        v.
                                               (Plf.'s Motion for Partial Summary
12   #8170, CCDC GUARD, *et al.*,              Judgment – dkt. no. 95;
                                               Defs.' Motions for Summary Judgment –
13                            Defendants.       dkt. no. 96 and dkt. no. 122)
14

15
16         Before the Court are Plaintiff Francis J. Pullano's Motion for Partial Summary
17   Judgment (dkt. no. 95), Defendants Clark County Detention Center, Sheriff Gillespie,
18   Former Deputy Chief Kirkegard, Officer Arb, Officer Wesley, Officer Wolfe, and Officer
19   Escobar's Motion for Summary Judgment (dkt. no. 96), and Defendants Judy Frank,
20   Elias S. Nolasco, Joe Venturina, and Nancy Goodman's Counter-Motion for Summary
21   Judgment (dkt. no. 122).
22   **I.     BACKGROUND**
23          **A.     Booking and Medical Conditions**
24          Plaintiff Pullano was sentenced to serve one year on a gross misdemeanor
25   charge for writing bad checks.  Pullano was incarcerated in the Clark County Detention
26   Center ("CCDC") between April 21, 2009, and June 16, 2009. NaphCare, Inc.
27   ("NaphCare") is a private corporation contracted to provide medical care to inmates at
28   CCDC.  Plaintiff suffers from various medical conditions including congestive heart

1   failure, hypertension, sleep apnea, osteoarthritis, and bipolar disorder.  (Dkt. nos. 3 at 6,
2   95 at 2, 95-Z.1, 95-Z.2, and 95.-Z.3.)   CCDC staff acknowledged these various
3   conditions after a medical screening conducted during his initial booking.  (Dkt. no. 96-A
4   at 33-34.)  NaphCare records demonstrate that NaphCare personnel knew of Pullano's
5   various medical conditions on April 21, April 22, and April 24, 2009.   Pullano was
6   dispensed medications consistent with preexisting unfulfilled prescriptions for the
7   treatment of these medical conditions.  (Dkt. nos. 95-A, 95-B, 95-E and *id.*)

8        During the booking process, CCDC staff explained how to request additional
9   medical attention while inside the detention center.  (Dkt. no. 96-A at 50.)  Pullano was
10  assigned to inmate module 4-L, an infirmary within CCDC that housed inmates with
11  special medical needs.  (Dkt. nos. 95-A and 96-A at 70.)  The module is open, and all
12  inmates are placed in a large room and assigned to cubicles.  (*Id.* at 35.)  While there,
13  inmates are instructed to remain at the day room, except for meal times, pill calls, using
14  the restroom, using the telephones, and walking to the guard desk.  (*Id.* at 35; dkt. no.
15  95-KK at 9-10.)  No exercise was allowed in the medical unit, and the exercise yard near
16  the unit remained off limits.  (Dkt. no. 95-KK at 9-10.)

17       **B.    Medical requests**

18       On April 22, 2009, the day after he was admitted, Pullano submitted a written
19  medical request to receive medication prescribed to him before incarceration.  (Dkt. no.
20  96-B.)  A NaphCare employee responded to his request and informed Pullano that a
21  psychiatrist needed to see him before those medications could be ordered.  (Dkt. no.
22  96-A at 49-50.)

23       On April 23, 2009, Pullano submitted a second medical request form complaining
24  of dizziness, lightheadedness, and headaches.  (Dkt. nos. 96-C and 96-A at 50-51.)
25  Pullano wrote this request after an attending NaphCare nurse instructed him to do so
26  earlier in the day.  A NaphCare employee responded to the request the same day and
27  placed him on the psychological sick call list for that week.  (Dkt. no. 96-A at 53.)
28  ///

2

On April 24, 2009, Pullano submitted a third written medical request to the NaphCare medical staff.  (Dkt. no. 96-D.)  The request asked for aspirin, increased dosage of his Niaspan medication, provision of a continuous positive airwave pressure ("CPAP") machine to treat his sleep apnea, and a request for a cane due to his need for a knee joint replacement.  (*Id.*)  Pullano submitted this request after being told to do so by a nurse who Pullano talked to while inquiring about receiving aspirin to treat his heart condition, dizziness, and headaches.  (Dkt. no. 96-A at 55.)  NaphCare staff responded to his request the same day by informing Pullano that all medications are given according to physician's orders and that he must make arrangements to retrieve his own personal CPAP machine.  (Dkt. no. 96-D.)

On April 25, 2009, Pullano submitted his fourth medical request form to NaphCare medical staff.  (Dkt. no. 96-E.)  Pullano cited procedure in the CCDC inmate handbook in order to request a doctor's appointment to discuss his medical conditions, including cardiomyopathy, sleep apnea, and osteoarthritis.  A response was written on the same day informing Pullano that he was scheduled for an April 28, 2009, sick call, the appropriate setting to discuss his medical conditions.  He was also informed that he had an outstanding order dating April 21, 2009, allowing him to use his CPAP machine.  (*Id.*)  In his deposition, Pullano testified that this fourth medical request was submitted because he wished to again alert staff of his medical conditions, and to make clear that he had not received his cane, his CPAP machine, aspirin, or received any other medical treatment.  (Dkt. no. 96-A at 61.)  Pullano testified that, up until the receipt of this form, he had not felt that he had received adequate medical treatment.  This response assured him that he would soon receive treatment, and that his medical "merry-go-round" the past week would end.  (*Id.* at 62-63.)

On the same day, Pullano submitted a separate "Inmate Request/Grievance" form to the CCDC correctional staff.  (Dkt. no. 96-F.)  Inmates and prison staff generally refer to these forms as "kites."  Pullano requested a free non-toll call to a friend to enable him to secure funds to be placed on house arrest, per the instructions he had received from

1    another officer.[1]  Two days later, on April 27, 2009, Pullano received a written response

2    from Sergeant Morrison advising him that free calls were not allowed, and that he should

3    write a letter to his friend.  Pullano testified that he submitted this request after becoming

4    frustrated with what he felt was the lack of appropriate responses to his medical

5    concerns about dizziness and headaches.  (Dkt. no. 96-A at 64.)

6        On April 28, 2009, Pullano submitted his fifth medical request form.  (Dkt. no.

7    96-G.)  He requested a fiber supplement to ease constipation, and noted that he was

8    instructed to do so by a doctor.  The responding NaphCare employee placed an order to

9    receive fiber pills at pill call for 30 days.  Pullano testified that he did not receive the pill

10   right away, and that it was "several days, maybe a week" before it was dispensed to him.

11   (Dkt. no. 96-A at 67.)

12       On May 3, 2009, CCDC staff transferred Pullano out of medical housing to

13   general population for the second time — the first transfer is described below.  Pullano

14   claims that before being moved out, he had his blood pressure checked.  According to

15   Pullano, the initial reading registered a very high blood pressure, so Defendant Judy

16   Frank, a nurse, attempted to retrieve a lower reading by using several different blood

17   pressure machines.  The lowest reading, 182/110, was ultimately used; Pullano alleges

18   that to have been the cause of this transfer.  Plaintiff alleges that he was incarcerated at

19   the Clark County Detention Center for 55 days, and only had his blood pressure

20   monitored on 5 different occasions.  (*See* dkt. no. 95-KK at 7.)

21       Later, on May 10, 2009, Pullano submitted another medical request asking to take

22   his medication at a different time than the scheduled pill call.  (Dkt. no. 96-J.)  Pullano

23   explained in his deposition that his Trazadone medication causes drowsiness, and puts

24   him to sleep.  Since the medication is dispensed at 7:00 pm, just prior to free time

25   among the inmates, Pullano is awoken when the inmates return from their free time at

_____

27       [1]It appears from the record that Pullano and his counsel had expected a lesser
28   sentence than what he received.  His lawyer immediately sought house arrest as an
     option for Pullano.  (Dkt. no. 96-A at 65.)

1   around 11:00 pm.  Pullano asked Dr. Hayes during his May 8, 2009, examination to
2   have his medication dispensed closer to 10:00 pm. Dr. Hayes told Pullano that he could
3   take the Trazadone medication at the 9:00 pm to 10:00 pm pain medication call.  On
4   May 12, 2009, NaphCare staff responded by informing Pullano that pill calls are done
5   only at regularly scheduled times.  (Dkt. no. 96-J.)

6       On May 15, 2009, Pullano submitted another medical request regarding swelling
7   he was experiencing, requesting medication that he had previously been prescribed to
8   treat the issue.  (Dkt. no. 96-L.)  A response was issued the same day saying that he is
9   scheduled for a sick call in which he can discuss these issues.  Pullano testified that he
10  received adequate care and was given a particular medication to respond to that issue.
11  (Dkt. no. 96-A at 114-15.)

12      On May 19, 2009, Plaintiff submitted another inmate grievance to Sergeant
13  Wesley complaining of treatment he received from Mary Brammer, another NaphCare
14  nurse.[2]  (Dkt. no. 96-M.)  In the grievance, he complained that Brammer singled him out
15  for poor treatment by giving him incorrect medication on 5 occasions, punishing him
16  during pill call by forcing him to sit and wait for his medications, not stirring some of his
17  medications, and other forms of punishment.  (*Id.*)  A response was issued the same
18  day, informing Pullano that he ought to be more cooperative with medical staff.  Pullano
19  did not appeal the decision, but felt it was not responsive to his concerns.  (Dkt. no. 96-A
20  at 117.)

21      On May 29, 2009, Pullano submitted a medical request notifying medical staff that
22  they had missed a psychiatric appointment scheduled with Pullano.  (Dkt. no. 96-N.)
23  Pullano testified that a member of the psychiatric staff had informed Pullano earlier in his
24  stay that should he experience any psychiatric or mental issue, he should let the staff
25  know promptly and they would see him before his next scheduled appointment.  (Dkt. no.
26  96-A at 130.)  Two weeks before May 29, Pullano had requested advanced psychiatric

27
28      [2]Pullano initially named Brammer as a defendant in the litigation, but failed to
    serve Brammer with the suit.  Consequently, Brammer is not a party to the litigation.

1  care, but was told to wait until the end of the month for his scheduled appointment on

2  May 29, 2009.  Psychiatric staff then missed his appointment, and Pullano subsequently

3  wrote this request.  (*Id.* at 130-32.)  Staff responded to his request informing Pullano that

4  his appointment will be rescheduled.

5      **C.    Cane confiscation**

6      As noted, on April 24, 2009, Pullano requested a cane for use because of his

7  need for a knee joint replacement.  Pullano was provided a cane in late April 2009 to

8  assist him in walking.  (Dkt. no. 96-A at 72-73.)  The NaphCare order for a cane was

9  dated April 28, 2009.  (Dkt. no. 95-L.)

10     On May 1, 2009, Pullano was moved out of the medical 4-L module and placed in

11  the 5N general population module.  (Dkt. no. 96-H.)  Pullano had spoken earlier with

12  Defendant Nancy Goodman, who told him that she was unhappy about his constant

13  medical requests and his requests for aspirin.  According to Pullano, he was "out of the

14  blue" transferred out of the medical unit after these conversations.  Pullano described

15  these conversations as "not argumentative" and "straightforward and short."  (Dkt. no.

16  96-A at 68.)  Pullano further described how Defendant Joseph Venturina, a nurse, had

17  instructed another attending nurse practitioner that Pullano should be moved out of

18  medical housing.  According to Pullano, the nurse practitioner refused, citing Pullano's

19  extensive medical needs.  Venturina contested Pullano's stay at medical housing and

20  bent over and told Pullano that, "I want you out of here," and instructed Pullano to "get

21  out of my face."  (Dkt. no. 68-A at 70.)

22     That day, the CCDC 4-L supervisor, Defendant Cesar Escobar, instructed Pullano

23  to pack up his belongings to prepare for a transfer to general population.  (Dkt. no. 68-A

24  at 75.)  Escobar also confiscated Pullano's cane before the transfer.  (*Id.*)  When Pullano

25  asked how he would move around, Escobar told Pullano that he would be forced to do a

26  "pimp walk."  (*Id.*)  Pullano testified that he was very anxious at this point because of his

27  transfer, and he immediately filed a grievance.  He was seen "in a matter of minutes" by

28  the floor sergeant on duty.  (Dkt. no. 68-A at 74.)  The floor sergeant responded quickly

1    to Pullano's concerns, was informed that Pullano uses a cane, and transferred Pullano

2    back that same evening.  (Dkt. no. 68-A at 82-83.)   Pullano testified that the transfer

3    back to the medical unit was due to the cane confiscation.  (*Id.* at 83.)

4        The next morning, on May 2, 2009, Pullano discussed having his cane returned

5    with Goodman.  She refused his request for a cane, even after Pullano informed her that

6    he had before been issued that cane.  (Dkt. no. 68-A at 83-84.)   According to Pullano

7    and other inmates, she responded by saying, "You don't understand. It's not up for

8    debate. You don't use a cane."  (*Id.* at 83; dkt. nos. 95-D, 95-KK at 6, and 95-R.)

9    Pullano responded by saying that he would write a kite to request a cane.  Goodman told

10   him not to write any more kites.  Officer Mitchell, who witnessed the encounter, ordered

11   Pullano back to his bunk.

12       Between May 2 and May 13, 2009, Pullano made many verbal requests and filed

13   medical requests/grievances regarding the return of his cane.  Only after contacting an

14   attorney and filing an escalated grievance to the 4-L Floor Sergeant was his cane

15   returned.  (*See* dkt. no. 95-KK at 6.)

16       **D.    CPAP Machine**

17       In April 2009, Pullano complained about lack of access to his CPAP machine to

18   treat sleep apnea.  Pullano arranged for the delivery of his CPAP machine from his

19   residence in Indiana.  The machine arrived at CCDC on May 1, 2009.  (Dkt. no. 95-EE.)

20   On May 2, 2009, Pullano sent a kite to CCDC's Chaplain asking for help retrieving his

21   CPAP machine, which had not been delivered to Pullano, and for access to three

22   documents from prior doctor's visits that would assist requesting medical care.  (*See* dkt.

23   no. 95-C.1.)

24       On May 4, 2009, Pullano sent another medical kite stating his need for his CPAP

25   machine.

26       On May 5, 2009, Pullano submitted an inmate grievance to CCDC officials again

27   asking for his CPAP machine, which he noted was received on May 1, 2009.  (Dkt. no.

28   96-I.)  Pullano was told shortly thereafter that his CPAP machine had been sitting in an

1    examination room in the medical module and had been there for at least a few days.

2    (Dkt. no. 95-KK at 8 and 96-A at 98.)

3        During a scheduled medical examination on May 8, 2009, Pullano's attending

4    doctor, Dr. Hayes, asked Defendants Goodman and Venturina if they knew where

5    Pullano's CPAP machine was located.  (Dkt. no. 95-KK at 8.)  They said no.  Pullano

6    then pointed out the machine, which had been left in the examination room with its

7    original shipping box.  (*Id.*)   According to Pullano, Dr. Hayes ordered Goodman and

8    Venturina to set up the CPAP machine.  Pullano also testified that Dr. Hayes ordered

9    regular exercise for him in order to treat his cardiomyopathy, and ordered Pullano place

10    himself on a self-imposed diet.  (*Id.* at 8-9.)

11        On May 9, 2009, a response was made to Pullano's May 5, 2009, grievance

12    saying that Pullano was informed that he is responsible for retrieving any missing parts

13    of his machine.  (Dkt. no. 96-I.)  Pullano was told by a fellow inmate that the inmate

14    overheard various Defendants saying that a power cord could not be located for

15    Pullano's CPAP machine.  (Dkt. no. 95-KK at 9.)  Pullano called home, and was assured

16    that the power cord was shipped in the box.  Having not yet received his CPAP machine,

17    Pullano wrote a medical request on May 10, 2009, inquiring about whether the rumor

18    regarding the power cord was true.[3]   After filing the request, Pullano testified that

19    Defendant Nancy Goodman went back to his cubicle and told him that he had already

20    been informed of the missing power cord.  (Dkt. no. 96-A at 107-08.)  She told him that

21    he should not write any more requests.

22    ///

23    ///

24    ///

25    ///

26

27        [3]This request was not in the record before the Court.  Pullano testified in his deposition that he does not have a copy of this request because it was not returned to him.  He testified, however, that he kept personal notes on all of his medical requests.

28    (Dkt. no. 96-A at 107.)

1    In addition to the medical request, Pullano submitted a CCDC inmate
2  request/grievance on May 10, 2009,[4] explaining that he feared retaliation out of his
3  attempts to redress various problems with his medical care.  (Dkt. no. 96-K.)   The
4  request documents his transfers out of medical housing, the cane confiscation,
5  withholding of his CPAP machine, orders for him not to write new kites, statements about
6  prior discussions regarding his CPAP parts which Pullano believed were false, and
7  several mistaken provisions of medications by medical staff.[5]   Pullano testified that these
8  various events placed him in a precarious position, as he sensed that he was being
9  singled out for poor treatment and wanted to ensure that he was not retaliated against,
10  given his medical conditions.  (Dkt. no. 96-A at 107-10.)   After writing this request,
11  Sergeant Wesley met with Pullano and told Pullano that she would follow up with his
12  grievances and resolve issues with medical staff.  (*Id.* at 112-13.)

13    **E.    Exercise**

14    On June 6, 2009, Plaintiff submitted a medical request complaining about not
15  being able to perform doctor-ordered physical exercise in the medical housing unit.  (Dkt.
16  no. 96-P.)  He testified that both his personal doctor and the CCDC doctor had ordered
17  physical exercise for him, and he requested cardio exercise in the form of walking
18  between the aisles of the medical unit.  (*Id.*)

19    Before submitting this request, Pullano alleged that he discussed his exercise
20  needs with a number of CCDC officers.  From May 1 to May 12, 2009, Pullano made
21  several inquiries to the guards and inmates about exercise, since his presiding doctor
22  ordered exercise daily.  (*See* 95-KK at 9.)  They all responded that exercise within the
23  medical unit is prohibited and that the adjacent exercise yard is off limits.  (*See dkt. no.*

24  _____

25    [4]The request was dated May 13, 2009, but Pullano testified that the date was
26  actually May 10, 2009, and was an inadvertent mistake based on the difficulty of
   ascertaining the date while incarcerated. (Dkt. no. 96-A at 106, 110).

27    [5]Pullano wrote that medications were dispensed mistakenly several times.  He
28  thought they were inadvertent mistakes not done purposely, but he wrote in the request
   that such mistakes were dangerous.

1    95-KK at 9-10.)  Dr. Hayes, in his May 8, 2009, medical examination of Pullano, ordered

2    Pullano to seek regular exercise to treat his medical conditions.  Pullano testified that Dr.

3    Hayes knew that exercise was not allowed but that Dr. Hayes told Pullano to find a way

4    to do so anyhow.  (Dkt. no. 96-A at 138, 140.)

5           After the medical examination, Pullano asked Defendant Wolfe, a CCPD officer,

6    about the availability of exercise and his doctor's orders.  (Dkt. no. 96-KK at 9.)  Wolfe

7    responded that no exercise was available and the exercise yard attached to the medical

8    housing unit was "off limits."  (*Id.*)  He reiterated CCDC's policy that during free time

9    inmates are only allowed to walk to the phones, guard desk, showers, or the day room

10   where they must take a seat.  (*Id.* at 10.)  Wolfe would regularly make announcements

11   concerning free time policy to the inmates.  (*Id.* at 10; dkt. nos. 96-R and 96-W.)  An

12   affidavit of Kevin Davis, a former medical unit inmate at the CCDC, describes how Wolfe

13   did not allow inmates to go to the exercise yard in part because past inmates were

14   caught slipping notes to an adjacent female unit during their time on the yard.  (Dkt. no.

15   96-W.)  Wolfe then ordered that medical unit inmates not have access to the yard, and

16   his subordinates would enforce this rule when Wolfe was not present.  (*Id.*)

17          According to Pullano, he had sought grievance forms to complain about the lack

18   of exercise, but was rebuffed.  Pullano in his deposition testimony describes one incident

19   where he attempted to procure a grievance form from Defendant Arb, another CCDC

20   officer.  Arb did not provide him with a grievance form to complain about the lack of

21   exercise as it would be a "waste of paper" and would not result in a change to the policy.

22   (Dkt. no. 96-A at 145-46.)

23          Pullano was able to secure a grievance form, and submitted it on June 6, 2009.

24   The form response denied Pullano's request, informing him that he must seek a doctor's

25   order about exercise and that the medical housing unit is currently unable to

26   accommodate his request.  (Dkt. no. 96-P.)  Unhappy with the response, Pullano

27   decided to send a typed letter directly to the Deputy Chief in charge of the Las Vegas

28   Municipal Police Department's Detention Services Division.  (Dkt. no. 96-A at 147-48.)

1    Pullano testified that he did so because he wanted to prevent interception of the

2    grievance request by the various officers who had denied his request for exercise earlier.

3    He testified that past grievances about medical treatment were read by the subjects of

4    the grievances, which caused him problems and subjected him to retaliation.   (*Id.*)

5    Pullano also testified that he did not request a medical order from Dr. Hayes, because he

6    understood Dr. Hayes' brief consultation with him to mean that Dr. Hayes had no

7    authority to provide Pullano with the exercise that he knew to be prohibited at the

8    medical unit.  (*Id.* at 150.)

9        **F.    Lawsuit**

10       Pullano submitted his last medical request on June 14, 2009, requesting left knee

11   joint replacement surgery because his knee brace had failed to prevent pain in his knee.

12   (Dkt. no. 96-Q.)  Medical staff responded by placing him on the sick call, but Pullano was

13   released on house arrest on July 16, 2009, before a scheduled appointment.  (Dkt. no.

14   96-A at 153-54.)

15       Pullano filed this action *in forma pauperis* on June 4, 2010.  He alleges various

16   violations of his civil rights based on the conduct of the nurses and guards at CCDC.

17   Specifically, Pullano contends that his First Amendment rights were violated when his

18   attempts to file grievances were blocked, diverted, denied, or otherwise limited by CCDC

19   and NaphCare staff.   Pullano also alleges that his Eighth Amendment rights were

20   violated when, during various periods of his incarceration, staff members withheld his

21   CPAP device needed to treat his sleep apnea, deprived him use of a medically

22   necessary cane, failed to give him appropriate medication, temporarily removed him

23   from medical housing, failed to monitor his medical condition, failed to give certain

24   treatments, did not allow him sufficient exercise, exposed him to dangerous conditions,

25   and failed to provide him adequate lighting, toilet facilities, and sleep.

26       On July 8, 2011, the Court issued an order granting in part and denying in part

27   Defendants' Motions to Dismiss.  (Dkt. no. 83.)  Pullano's Eighth Amendment claims

28   against Defendants Judy Frank, Elias S. Nolasco, Joseph Venturina, and Nancy

Goodman ("the NaphCare defendants") survived, as did his Eighth Amendment claims against Defendants Escobar and Wolfe ("the CCDC defendants").   Judgment on the pleadings for Defendants CCDC, Sheriff Gillespie, and Former Deputy Kirkegard was entered.   Pullano's First Amendment claims were dismissed, as were his Eighth Amendment claims against NaphCare, Inc. and the NaphCare defendants in their official capacity.

On September 9, 2011, Pullano filed his Motion for Partial Summary Judgment against all remaining defendants except for Nolasco.  (Dkt. no. 95.)  Shortly thereafter, on September 16, 2011, the CCDC defendants filed their own Counter-Motion for Summary Judgment.  (Dkt. no. 96.)  The NaphCare defendants responded to Pullano's Motion on September 26, 2011, and also filed a Counter-Motion for Summary Judgment against Pullano.  (Dkt. nos. 108 and 122.)

## II.    LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996).  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89

1   (1968)).  In evaluating a summary judgment motion, a court views all facts and draws all

2   inferences in the light most favorable to the nonmoving party.  *Kaiser Cement Corp. v.*

3   *Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

4        The moving party bears the burden of showing that there are no genuine issues

5   of material fact.  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In

6   order to carry its burden of production, the moving party must either produce evidence

7   negating an essential element of the nonmoving party's claim or defense or show that

8   the nonmoving party does not have enough evidence of an essential element to carry its

9   ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

10  F.3d 1099, 1102 (9th Cir. 2000).   Once the moving party satisfies Rule 56's

11  requirements, the burden shifts to the party resisting the motion to "set forth specific

12  facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The

13  nonmoving party "may not rely on denials in the pleadings but must produce specific

14  evidence, through affidavits or admissible discovery material, to show that the dispute

15  exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do

16  more than simply show that there is some metaphysical doubt as to the material facts."

17  *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).

18  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

19  insufficient." *Anderson*, 477 U.S. at 252.

20       Further, "when parties submit cross-motions for summary judgment, '[e]ach

21  motion must be considered on its own merits.'"  *Fair Hous. Council of Riverside County,*

22  *Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W.

23  Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D.

24  441, 499 (Feb. 1992) (citations omitted).  "In fulfilling its duty to review each cross-motion

25  separately, the court must review the evidence submitted in support of each cross-

26  motion." *Id.*

27  ///

28  ///

1    III.    **DISCUSSION**

2           Pullano's surviving claims against the various defendants can be divided into two

3    main categories: violations of his Eighth Amendment right to adequate medical care, and

4    violations of his Eighth Amendment right to be free of cruel and inhumane prison

5    conditions.  He seeks summary judgment on claims related to inadequate medical care

6    and the lack of exercise provided to him during his incarceration.  Defendants filed cross-

7    motions for summary judgments on the same claims.  In addition, the CCDC Defendants

8    seek summary judgment on Counts VI and VII concerning non-exercise related

9    conditions of confinement claims.  The CCDC Defendants also seek summary judgment

10   on Pullano's already-dismissed First Amendment claims, as well as Eighth Amendment

11   claims relating to discourteous conduct which do not appear in Pullano's Complaint.

12   These claims are addressed in this Section in order, in addition to a preliminary

13   challenge raised by the NaphCare Defendants.

14          A.    **Compliance with Local Rule 56-1**

15          The NaphCare Defendants ask the Court to deny Pullano's Motion on the grounds

16   that he did not comply with Local Rule 56-1's requirement that a summary judgment

17   motion be accompanied with a statement of material facts.  While Pullano's Statement of

18   Material Facts (dkt. no. 95 at 19-22) fails to appropriately list each material fact as

19   required by Local Rule 56-1, the Court's obligation to consider *pro se* summary judgment

20   motions "with less than strict literalness" requires that this pleading defect not be used to

21   invalidate Pullano's otherwise proper filing.  *See Thomas v. Ponder*, 611 F.3d 1144,

22   1150 (9th Cir. 2010) (quoting *Jacobsen v. Filler*, 790 F.2d 1362, 1365 n.4 (9th Cir. 1986).

23   The Court will not deny Pullano's Motion on this basis.

24          B.    **Eighth Amendment Inadequate Medical Care Claims**

25                 1.    **Standard of Review**

26          Although prisoners may be deprived of some of their rights fundamental to liberty,

27   they "retain the essence of human dignity inherent in all persons."  *Brown v. Plata*, 131

28   S. Ct. 1910, 1928 (2011).  The Eighth Amendment protects this dignity in its prohibition

against cruel and unusual punishment. Because society takes from prisoners their liberty to provide for themselves, they become dependent on the State for shelter, food, clothing, and medical care. "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Id.*

"[T]he government has an obligation to provide medical care for those whom it punishes by incarceration," *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988), and cannot be deliberately indifferent to the medical needs of its prisoners. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he appropriate inquiry when an inmate alleges that prison officials failed to attend to serious medical needs is whether the officials exhibited deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle*, 429 U.S. at 104. Prison doctors, medical staff, or prison guards can all be liable for Eighth Amendment violations. *Id.* The Supreme Court has identified two forms of deliberate indifference: when prison officials deny, delay or intentionally interfere with medical treatment, or by the way in which prison physicians provide medical care. *See Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104-05).

In the Ninth Circuit, the test for deliberate indifference consists of two parts. *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the plaintiff must show a "serious medical need" by demonstrating that failure to treat her or his condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.* A serious injury is not the type of "routine discomfort [that] is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson*, 503 U.S. at 9 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's

1   daily activities; or the existence of chronic and substantial pain are examples of
2   indications that a prisoner has a 'serious' need for medical treatment." *McGuckin*, 974
3   F.2d at 1059-60 (citations omitted).

4          Second, the plaintiff must demonstrate that the defendant's response to the need
5   was deliberately indifferent by showing (a) a purposeful act or failure to respond to a
6   prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett v.*
7   *Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations and citations omitted).
8   The requirement of a purposeful act/failure to respond is intended to preclude a finding
9   of deliberate indifference for accidents or inadvertent failures to provide adequate
10  medical care.  *Estelle*, 429 U.S. at 105.   Mere negligence does not rise to an Eighth
11  Amendment violation.   *Hutchinson*, 838 F.2d at 394.   In order to demonstrate harm
12  caused by the indifference, a prisoner need not show that the harm was substantial, but
13  such a showing would provide additional support for the inmate's claim of deliberate
14  indifference. *McGuckin*, 971 F.2d at 1060.

15         Once these requirements are met, the factfinder must determine whether the
16  defendant was deliberately indifferent to the prisoner's medical needs. *McGuckin*, 971
17  F.2d at 1060.  "[T]he more serious the medical needs of the prisoner, . . . the more likely
18  it is that a plaintiff has established 'deliberate indifference' on the part of the defendant."
19  *Id.* at 1061.  A finding that the defendant's neglect was isolated weighs against a finding
20  of deliberate indifference, while a repeated failure to treat an inmate or a single
21  egregious failure supports such a finding.  *Id.* at 1060-61.

22         With the legal framework of Pullano's case in mind, the Court turns to analyzing
23  his claims.  The alleged violations of Pullano's Eighth Amendment right to adequate
24  medical care can be roughly categorized into the following categories: failure to provide
25  his CPAP machine; confiscation of his cane; transfer out of medical housing; lack of
26  exercise privileges; failure to dispense medications; deliberate low readings of blood
27  pressure; and other miscellaneous inadequacies in medical care.  The Court will discuss
28  these in order.

## 2. Failure to provide CPAP machine

Pullano charges Defendants Venturina, Frank, and Goodman with failing to provide him his ordered CPAP machine.[6]   The CPAP machine was used to treat Pullano's sleep apnea.   On the third day after booking, Pullano submitted a medical request for the machine.   The response informed Pullano that he must make his own arrangements to bring his CPAP machine from home.

Under the Ninth Circuit's test, the first question to ask in examining these claims is whether Pullano had a "serious medical need" that the CPAP remedied.   According to Pullano's Motion, the CPAP machine treated his severe sleep apnea.   The NaphCare Defendants do not contest the seriousness of sleep apnea, nor does their medical expert, Dr. Robert Jones.   Therefore, for the purposes of this discussion, the Court assumes the seriousness of sleep apnea.

The Court must next determine whether Pullano met his burden in demonstrating that Defendants exhibited a deliberate indifference to that serious medical need.   To do so, he must show (a) a purposeful act or failure to respond to his pain or possible medical need and (b) harm caused by the indifference.

The Court holds that no genuine issue of material fact exists on the question of whether Defendants' failure to provide Pullano with a CPAP machine to treat his sleep apnea constituted a purposeful act or failure to respond.   The undisputed facts before the Court demonstrate that Defendants Venturina, Frank, and Goodman purposely failed to respond to Pullano's serious need for his CPAP machine in light of the seriousness of Pullano's medical condition, the numerous notices they received of the machine laying idle in the medical unit, and the general disinterest that characterized their response.

---

[6]The NaphCare Defendants object to Pullano's request for summary judgment against Frank on the CPAP delay, pointing out that his Complaint did not allege that Frank was in any way responsible for the delay. This claim is meritless, since Count II of Pullano's Complaint specifically alleges Eighth Amendment violations against "the Defendants," of which Frank is one.  (Dkt. no. 3 at 14.)  That discovery might yield precisely who among the defendants is responsible for any particular action is unsurprising, since plaintiffs — particularly those proceeding *pro se* — do not need to plead facts with neat precision.

1    The NaphCare Defendants knew of Pullano's request for a CPAP machine by April 24,

2    2009.  After Pullano made arrangements to have his own machine sent to him (even

3    though some evidence in the record suggests that NaphCare provided other inmates

4    with NaphCare-owned CPAP machines, *see* dkt. nos. 95-KK at 2 and 95-R[7]), the

5    machine lay dormant for days until Pullano had to identify the machine to Defendants

6    himself.   The NaphCare Defendants do not contest the fact that Pullano's CPAP

7    machine lay idle for days after its receipt at the CCDC.   Though the NaphCare

8    Defendants argue that a roughly week-long delay between Pullano's power cord request

9    from his friend in Indiana and Pullano's eventual receipt of the CPAP machine is not

10   unreasonable, this reasoning masks the amount of days that the machine was in the

11   custody of CCDC without being provided to Pullano and minimizes the seriousness of

12   the machine to Pullano's health.  Had they provided Pullano with the machine earlier, he

13   would have had the opportunity to request the power cord earlier.  Not providing Pullano

14   with a NaphCare-owned CPAP machine, not providing the machine after its receipt,

15   ignoring three requests for the machine, and failing to provide it when it was easily

16   accessible all demonstrate Defendants' deliberate indifference to Pullano's medical

17   need.

18        There is, however, insufficient evidence to conclude that Pullano suffered harm as

19   a result of the sleep apnea.  In support of their position that no harm resulted from the

20   delay in providing the CPAP machine, the NaphCare Defendants rely on two pieces of

21   evidence: Pullano's admission that he had not been diagnosed by a medical provider

22   _____

23        [7]The NaphCare Defendants argue that the affidavits of Kevin Davis and Frank
     Blackburn should be disregarded since they were not witnesses nor signed in the
24   presence of a notary public.  The affidavits were signed and written expressly to conform
     to NRS 208.165, which provides that "[a] prisoner may execute any instrument by
25   signing his or her name immediately following a declaration 'under penalty of perjury'
     with the same legal effect as if he or she had acknowledged it or sworn to its truth before
26   a person authorized to administer oaths."   Although the sufficiency of evidence in
     support of summary judgment is a matter of federal, not state, law, the Court considers
27   the affidavits as they are sworn by their authors and relay events and facts in the
     personal knowledge of the affiants.  *See* Fed. R. Civ. P. 56(c)(4).  For this reason, the
28   affidavits of Davis and Blackburn, as well as Pullano, are considered in determining
     summary judgment.

1   with any medical conditions caused from not using a CPAP machine; and Dr. Jones'

2   expert review of Pullano's medical records.[8]   Pullano himself did not provide any

3   evidence of harm arising out of this episode.  In the absence of any evidence showing

4   that Pullano suffered harm from the withholding of his CPAP machine, the Court finds

5   that Pullano cannot satisfy the second requirement of the deliberate indifference test.

6   Accordingly, the Court cannot grant summary judgment in Pullano's favor.

7          Defendants Frank, Goodman, and Venturina, in response to Pullano's Motion,

8   counter-moved for summary judgment on all claims.  They seek summary judgment on

9   the CPAP issue principally by arguing that the delays in providing Pullano his CPAP

10  machine were not unreasonable, and that Pullano has not proffered evidence showing

11  harm suffered as a result of these delays.   While the Court has concerns about

12  Defendants' delays in failure to provide Pullano's CPAP machine in a timely manner,

13  their summary judgment on this issue is nonetheless granted on the grounds that

14  Pullano has failed to show evidence of harm.

15                    **3.      Confiscation of cane**

16         Pullano seeks summary judgment against Defendants Goodman and Escobar

17  arising out of the confiscation of his medically-ordered cane.  Defendant Goodman in her

18  Counter-Motion argues that the cane was discharged from Pullano on May 3, 2009, after

19  a physician's assistant noted that his ambulation was steady.  (*See* dkt. no. 96-A at 43.)

20  For that reason, Goodman argues that she was not responsible for the cane's

21  confiscation.  Goodman also argues that Pullano did not need his cane, since he was

22  required to walk only short distances during his time in detention.  Lastly, Goodman

23  points out that Pullano did not offer evidence of harm suffered as a result of the cane's

24  _____

25         [8]The expert medical opinion first filed by the NaphCare Defendants appeared to
    have an erroneous listing of documents upon which Dr. Jones relied in forming his
    medical opinion.  Pullano, in his Response, pointed out the discrepancies (*see* dkt. no.
26  123 at 9-10), and the NaphCare Defendants filed a Notice of Errata with a corrected
    version of the medical report (*see* dkt. no. 113).  This Notice of Errata is the subject of
27  Pullano's Motion to Strike (dkt. no. 115), which is decided in a separate order.  For the
    purposes of this Order, the Court relies on the corrected medical report, and finds it
28  credible in light of the circumstances.

1   confiscation, and noted that Dr. Jones testified that the cane confiscation did not result in

2   any injury to Pullano.  Defendant Escobar in his Counter-Motion also argues that he did

3   not cause the confiscation of Pullano's cane, and that other CCDC personnel promptly

4   returned his cane after Pullano made inquiries about it.

5        For the same reasons outlined in the Court's discussion of the CPAP machine,

6   Pullano cannot succeed on summary judgment because he has failed to demonstrate

7   harm resulting from the cane's confiscation.  NaphCare staff provided Pullano a cane

8   around April 28, 2009, in response to medical requests Pullano made in light of his weak

9   knee and degenerative joint disease.  The NaphCare Defendants do not contest the

10  seriousness of Pullano's medical conditions with respect to his knee; the Court thus

11  holds as serious the medical need for a cane.  *See, e.g.*, *Rosales v. Couglin*, 10 F.

12  Supp. 2d 261, 269 (W.D.N.Y. 1998) (seizure of prescribed cane can give rise to Eighth

13  Amendment violation); *Hemmings v. Gorczyk*, 134 F.3d 104, 108-09 (2d Cir. 1998)

14  (holding that seizure of crutches can state an Eighth Amendment claim).

15       A genuine issue of material fact exists as to whether Defendants Goodman and

16  Escobar acted purposefully when confiscating Pullano's cane.  According to Pullano,

17  Escobar's statements that Pullano would be forced to do a "pimp walk" in general

18  population without his cane demonstrate, at the very least, deliberate indifference toward

19  the seriousness of Pullano's conditions.  Upon his return to the medical housing unit,

20  Defendant Goodman's statements that Pullano's cane use was "not up for debate" also

21  exhibits an intentional withholding of Pullano's cane notwithstanding prior orders to

22  provide him with the cane.[9]  However, the NaphCare Defendants point to a record made

23  _____

24       [9]The NaphCare Defendants challenge the propriety of Blackburn's affidavit by
     arguing that Goodman's statements, as heard by Blackburn, are inadmissible hearsay

25  under the Federal Rules of Evidence.  Goodman told Pullano that he does not use a
     cane and he would have to do without it.  This statement can be considered by the

26  Court, as it is not offered to assert the truth of the matter contained therein.  *See* FRE
     801(c)(2).  Its relevance is premised on Goodman's making the statement, not based on

27  whether the statement is itself true or false.  *See United States v. Payne*, 944 F.2d 1458,
     1472 (9th Cir. 1991) (holding that a statement not offered for truth of the matter asserted

28  but instead to show its effect on the listener was "properly treated as non-hearsay").

1   by a physicians' assistant on May 3, 2009, observing that Pullano's ambulation was

2   steady and apparently showing that the cane would be withdrawn.  The withholding of

3   the cane could have been the result of this examination, even though it post-dates the

4   cane's first confiscation and Defendant Goodman's statements.

5          Moreover, Pullano failed to provide any evidence that he suffered harm as a result

6   of the confiscation.  The only evidence submitted is the expert testimony of Dr. Jones

7   who concluded that the deprivation of the cane did not, in his expert opinion, lead to any

8   medical harm.  Thus, on this record, Plaintiff has failed to meet his burden on summary

9   judgment, and his request as to the cane confiscation is denied.  Defendants Goodman

10  and Escobar's Counter-Motion on this issue is granted.

11              **4.    Transfer From Medical Housing**

12         Pullano also complains in his Motion about transfers from medical housing into

13  general population at the hands of Defendants Venturina, Frank, Goodman, and

14  Escobar.   Defendants argue that the transfers out of the medical infirmary were

15  medically insignificant, and that Pullano did not allege that he suffered harm as a result

16  of the transfers.

17         The record before the Court demonstrates that Pullano's medical conditions are

18  serious, and that medical housing was necessary to prevent serious harm.  Defendants

19  do not contest the seriousness of Pullano's conditions, which include congestive heart

20  failure, hypertension, sleep apnea, osteoarthritis, degenerative joint disease, and bipolar

21  disorder.  That he was ordered medical housing by the CCPD and NaphCare during the

22  duration of his stay confirms the seriousness of his condition.

23         However, there is a genuine issue of material fact as to whether the NaphCare

24  Defendants purposefully transferred Pullano out of the medical infirmary.  He was first

25  assigned to the medical unit upon booking.  Pullano then alleges that, after numerous

26  requests were filed, he was transferred out of the medical unit on May 1.  He attributes

27  this transfer in part due to a conversation he had with Defendant Goodman regarding his

28  medical requests.  He also pointed to Defendant Venturina's earlier statement to another

1  nurse requesting he be transferred out of medical housing, presumably because of his

2  constant medical requests.   Defendants have not articulated any legitimate basis for

3  Pullano's transfers from medical housing.   There is no indication that the seriousness of

4  Pullano's medical conditions subsided for any period of time to necessitate transfer.   The

5  same medical record created by a physicians' assistant concerning Pullano's cane

6  confiscation appears also to order Pullano to general population.   (*See* dkt. no. 108-A at

7  43. (stating "To GP").)   To the extent that the NaphCare Defendants suggest that they

8  were not responsible for the transfer, this record lends some support for their position.

9         Nevertheless, Pullano fails to demonstrate harm arising out of his medical

10  transfers.   Even though his brief transfers out of medical housing flouted a serious

11  medical need, Pullano has not demonstrated any harm suffered as a result, and thus

12  cannot succeed on an Eighth Amendment claim.   Conversely, Defendants Venturina,

13  Frank, Goodman, and Escobar filed cross-motions for summary judgment, supported by

14  medical expert testimony, arguing that the transfers did not result in any harm.   Faced

15  with the medical expert testimony on one side, and a lack of any evidence on the other

16  side, the Court grants summary judgment in favor of Defendants on this issue.

17              **5.        Mistaken and denied dispense of medication**

18         Pullano also seeks summary judgment against Defendants Goodman and

19  Venturina arguing that they made numerous mistakes in his medication dispersals, at

20  times denied him medication, and scheduled him to non-medical psychological sick call

21  when he needed medical attention.   Specifically, Pullano alleges that Defendant

22  Venturina purposely ignored his medical requests and purposely misdirected him to a

23  scheduled non-medical, psychological sick call.   Pullano also alleges that Defendant

24  Goodman denied him medications and caused his sleep medication to be dispensed at

25  7:00 pm instead of 10:00 pm.

26         Defendants Goodman, Venturina, and Nolasco filed counter-motions for summary

27  judgment on this issue.   Though Pullano did not originally seek summary judgment

28  against Nolasco, Nolasco moved for summary judgment on the grounds that the only

1  remaining allegations against him – forcing Pullano to sit during the dispensing of
2  medications to inmates – is not an Eighth Amendment violation.

3      Pullano's Motion fails on these issues for several reasons.  First, it is not clear
4  from the briefing whether Goodman and Venturina's alleged conduct occurred in
5  response to a serious medical need.  Goodman's denial of Pullano's medications at the
6  7:00 pm hour arguably does not rise to the standard of serious need, but might rather be
7  characterized as a "routine discomfort."  *See Hudson*, 503 U.S. at 9.  The need for the
8  later dispensing was to allow Pullano to sleep through the hustle of returning inmates
9  that would awaken him at 11:00 pm.  Without any demonstration that his sleep at 7:00
10 pm is particularly important for his medical conditions, or that he would not have been
11 awoken but for the late dispersal, this need is not the kind that the Court can
12 characterize as serious.  Further, Pullano has again failed to demonstrate medical harm
13 resulting from this decision.  As a result, he cannot meet his burden against Goodman
14 on these allegations.

15     However, Pullano's allegations about Venturina ignoring his medical requests and
16 scheduling non-medical psychological examinations are serious.  Pullano alleges that
17 his April 23, 2009, request for medical attention regarding headaches, lightheadedness,
18 and dizziness were not appropriately responded to, since Defendant Venturina's
19 response was to place him on psychological sick call rather than medical sick call.  Since
20 the NaphCare Defendants knew about Pullano's many serious medical conditions, failing
21 to respond appropriately to serious symptoms like the ones outlined in his April 23, 2009,
22 request for medical care can be the basis for an Eighth Amendment violation. Further,
23 the evidence demonstrates a purposeful act on the part of Venturina in assigning
24 Pullano non-medical psychological sick call.  Pullano fails, however, to demonstrate
25 medical harm caused by not seeing a medical doctor in response to his April 23, 2009,
26 request.

27     Lastly, Defendant Nolasco seeks summary judgment against Pullano.  Pullano's
28 allegation against Nolasco concerns Nolasco allegedly taking Pullano out of the medical

1   lines during pill call.  Nolasco's summary judgment request is granted, since Pullano has

2   failed to demonstrate any harm resulting out of this incident.  In addition, it is not clear

3   from Pullano's briefing that a serious medical need was implicated by his being removed

4   from the pill line.  Pullano, in his Reply, argues against summary judgment on the ground

5   that Nolasco's actions were done in retaliation to Pullano's grievances about his

6   treatment by Nurse Brammer.  Since no Eighth Amendment violation can be sustained

7   based on these facts, Nolasco's Motion for Summary Judgment is granted.

8                       **6.      Low blood pressure reading**

9          Pullano further alleges that Defendant Frank violated his Eighth Amendment

10   rights by purposefully recording the lowest blood pressure reading during an

11   examination on May 3, 2009, which resulted in his transfer from medical housing to

12   general population.   The record cited by Pullano in support of his allegation is a

13   document entitled "Progress Notes" that documents various medical officials'

14   examinations of Pullano, including a 182/110 blood pressure reading conducted on the

15   same day by Carla Sams.  The notes also state that Pullano's blood pressure was

16   retaken by Sams again and recorded as 140/90.  Beyond Pullano's Motion and his

17   declaration, there is no indication that Defendant Frank was responsible for the

18   complained-of blood pressure reading, and no evidence to support Pullano's argument

19   that Frank sought to purposely manipulate his blood pressure reading.  Pullano also

20   does not demonstrate that the faulty reading led to any harm beyond medical transfer.

21   For this reason, Pullano's Eighth Amendment claims against Frank are denied, and

22   Frank's counter-motion is granted.

23              **C.      Eighth Amendment conditions of confinement claims**

24                       **1.      Legal standard**

25          In  addition  to  providing  adequate  medical  care  for  inmates,  the  Constitution

26   requires that the State "provide humane conditions of confinement."  *Farmer v. Brennan*,

27   511 U.S. 825, 832 (1994).  "An Eighth Amendment claim that a prison official has

28   deprived inmates of humane conditions must meet two requirements, one objective and

1  one subjective." *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1995).  "Under the objective

2  requirement, the prison official's acts or omissions must deprive an inmate of the minimal

3  civilized measure of life's necessities.  The subjective requirement, relating to the

4  defendant's state of mind, requires deliberate indifference."  *Id*. (citations omitted).

5             **2.    Lack of Exercise**

6       Pullano seeks summary judgment against Defendant Wolfe for failing to provide

7  Pullano with adequate access to exercise during his time in CCDC.  General population

8  inmates have access to an exercise yard, but those inmates housed at the medical unit

9  could not access an adjacent yard.   Pullano represented that he made numerous

10  requests to seek additional exercise, and was foiled in his attempt to receive grievance

11  forms to make such a request.  He was able to receive one in June, and filed it on June

12  6, 2009.

13       The CCDC Defendants argue that Pullano failed to request medical exercise

14  during his detention.  They also argue that the medical unit housing does not have the

15  capacity for exercise, and that valid penological reasons exist for not providing medical

16  inmates exercise.

17       Exercise is a "basic human need," the deprivation of which can sustain an Eighth

18  Amendment violation.  *See Allen*, 48 F.3d at 1088.  "For over thirty years, [the Ninth

19  Circuit has] emphasized that "some form of regular outdoor exercise is extremely

20  important to the psychological and physical well-being of the inmates."   *Thomas v.*

21  *Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010) (quoting *Spain v. Procunier*, 600 F.2d 189,

22  199 (9th Cir. 1979)).

23       Prison officials intentionally deprived Pullano of exercise.  This fact is not in

24  dispute.  The subjective element requires that the officials were deliberately indifferent to

25  Pullano's need for exercise.  "To establish a prison official's deliberate indifference, an

26  inmate must show that the official was aware of a risk to the inmate's health or safety

27  and that the official deliberately disregarded the risk."  *Foster v. Runnels*, 554 F.3d 807,

28  814 (9th Cir. 2009).  The CCDC Defendants were made aware, at or near booking, of

1   Pullano's serious medical conditions.  They were made aware specifically of Pullano's

2   requests for exercise as late as June 6, 2009, and as early as the beginning of May

3   2009.   For this reason, Pullano has made the required subjective showing that

4   Defendant Wolfe was deliberately indifferent to Pullano's need for exercise.  No genuine

5   issue of material fact exists on this requirement.

6          Notwithstanding Pullano's serious medical conditions and his requests for

7   exercise, the CCDC Defendants intentionally withheld exercise to all medical unit

8   inmates.  In their Response and Counter-Motion, they cite "penological interests" and

9   argue that exercise "is not a safe and orderly function in an infirmary setting."  The

10  CCDC Defendants can have no excuse for denying medical patients — particularly

11  those, like Pullano, whose serious medical conditions were known to prison officials —

12  the right to exercise while in detention.  *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132-

13  33 (9th Cir. 2000) (en banc) (holding that six and one-half week deprivation of outdoor

14  exercise violated Eighth Amendment); *Adams v. Wolff*, 624 F. Supp. 1036, 1039-40 (D.

15  Nev. 1985) (affirming damages award for nearly six weeks' deprivation of outdoor

16  exercise).  Of course, an inmate's right to exercise is not "absolute or indefeasible," *see*

17  *Norwood v. Vance*, 591 F.3d 1062, 1069 (9th Cir. 2009), and the need for maintaining

18  the safety of inmates, for example, tempers this right, *see id.*  Here, however, the CCDC

19  Defendants have made no showing that Pullano's right to exercise should be curtailed

20  for safety concerns.  Mere recitation of a conclusory penological interest does not undo

21  Defendants' violation of Pullano's right to outdoor exercise, particularly in light of his

22  serious medical conditions that the CCDC Defendants were aware of.[10]  This ruling is

23  not meant to foreclose the possibility that such an interest might exist; prison officials

24

25          [10]This is particularly true in light of the evidence in the record, from the affidavit of
    inmate Kevin Davis, that CCDC medical housing inmates had previously had access to
26  the adjacent exercise yard, but that those privileges were taken away from them
    because of inappropriate contact with the nearby women's unit that shared the same
27  yard.  (*See* dkt. no. 95-W.1.)  The CCDC Defendants do not contest this fact.  That
    outdoor exercise was previously available to medical inmates undermines the CCDC
28  Defendants' position that exercise is not a "safe and orderly function in an infirmary
    setting."

1    may be able to demonstrate a legitimate penological interest in preventing inmates

2    housed in medical infirmaries from exercising outdoors.  But the Defendants here have

3    not met their burden of demonstrating such an interest in this case.  As a result, Pullano

4    has satisfied his burden of demonstrating that no genuine issue of material fact exists as

5    to the objective element of an Eighth Amendment conditions of confinement claim.

6                    **3.      Lighting, Seating, Electrical Hazard claims**

7               In addition to the withholding of exercise, Pullano's Complaint alleges Eighth

8    Amendment violations arising out of exposure to unsafe and inhumane conditions,

9    including lack of adequate lighting, forced standing, uncouth medical procedures, and

10   electrical hazards.  Pullano's Motion for Partial Summary Judgment sought summary

11   judgment on the claim related to access to exercise, but not on Counts VI on VII relating

12   to these other conditions.  These Counts have not been dismissed, and are pending

13   against the CCDC Defendants.  The CCDC Defendants filed their Counter-Motion for

14   Summary Judgment seeking summary judgment on all conditions of confinement claims.

15   In his Response, Pullano did not address these remaining conditions of confinement

16   claims.

17              The CCDC Defendants argue that no Eighth Amendment violation occurred

18   because these complaints, assuming they are true, do not rise to the level of

19   constitutional violations, no deliberate indifference to Pullano's housing and living needs

20   can be demonstrated, and that Pullano does not allege any harm resulting from these

21   conditions.  Upon making a showing, as done here, that the nonmoving party does not

22   have enough evidence of an essential element to carry out its burden of persuasion, the

23   non-moving party must set forth specific facts showing there is a genuine issue for trial.

24   *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102; *Anderson*, 447 U.S. at 256.

25   Pullano failed to respond to this portion of the CCDC Defendant's Motion, and failed to

26   proffer evidence showing a genuine issue of material fact on these non-exercise claims.

27   As a result, the CCDC Defendants' Motion is granted with respect to these claims.  *See*

28

1   *also* Local Rule 7-2(d) ("The Failure of an opposing party to file points and authorities in

2   response to any motion shall constitute a consent to the granting of the motion.").

3        **D.    First Amendment Retaliation Claim**

4        The CCDC Defendants appear to seek summary judgment on Pullano's First

5   Amendment claims, but those claims were dismissed per the Court's July 8, 2011,

6   Order.  This portion of the CCDC Defendants' Counter-Motion is thus denied as moot.

7        **E.    Discourteous Conduct**

8        The CCDC Defendants appear to seek summary judgment on purported claims of

9   constitutional violations arising out of discourteous conduct CCDC officials aimed toward

10  other inmates.  However, Pullano does not allege constitutional violations based solely

11  on prison staff's discourteous conduct toward him.   For this reason, the CCDC

12  Defendants' Counter-Motion on this issue is also denied as moot.

13       **F.    Municipal Liability Claims**

14       Lastly, the CCPD Defendants seek summary judgment on behalf of the Las

15  Vegas Metropolitan Police Department ("LVMPD") on the grounds that Pullano has not

16  demonstrated that the individual defendants were acting under a custom or policy of the

17  police department itself.  For that reason, they seek dismissal of Pullano's municipal

18  liability cause of action.

19       For the same reason that the CCPD Defendants' Motion is granted with respect to

20  the non-exercise conditions of confinement claims, their Motion is granted here with

21  respect to any causes of action against LVMPD.  Pullano did not respond to this portion

22  of the CCPD Defendants' Motion and failed to proffer evidence of a custom or policy to

23  create a triable issue of fact.

24  **IV.   CONCLUSION**

25       Accordingly, IT IS HEREBY ORDERED THAT  Plaintiff   Francis   J.   Pullano's

26  Motion for Partial Summary Judgment (dkt. no. 95) is GRANTED IN PART and DENIED

27  IN PART.

28  ///

1    IT IS FURTHER ORDERED THAT Defendants Clark County Detention Center,

2  Sheriff Gillespie, Former Deputy Chief Kirkegard, Officer Arb, Officer Wesley, Officer

3  Wolfe, and Officer Escobar's Motion for Summary Judgment (dkt. no. 96) is GRANTED

4  IN PART and DENIED IN PART.

5    IT IS FURTHER ORDERED THAT Defendants Judy Frank, Elias S. Nolasco, Joe

6  Venturina, and Nancy Goodman's Counter-Motion for Summary Judgment (dkt. no. 122)

7  is GRANTED.

8

9    Dated this 27th day of September 2012.

10

11    _____

12    UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28