UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

FRANCIS J. PULLANO,

                  Plaintiff,

    v.

#8170, CCDC GUARD, *et al.*,

                  Defendants.

Case No. 2:10-cv-00335-MMD-VCF

ORDER

(Plf.'s Motion for Partial Summary Judgment – dkt. no. 95; Defs.' Motions for Summary Judgment – dkt. no. 96 and dkt. no. 122)

      Before the Court are Plaintiff Francis J. Pullano's Motion for Partial Summary Judgment (dkt. no. 95), Defendants Clark County Detention Center, Sheriff Gillespie, Former Deputy Chief Kirkegard, Officer Arb, Officer Wesley, Officer Wolfe, and Officer Escobar's Motion for Summary Judgment (dkt. no. 96), and Defendants Judy Frank, Elias S. Nolasco, Joe Venturina, and Nancy Goodman's Counter-Motion for Summary Judgment (dkt. no. 122).

**I.    BACKGROUND**

    **A.    Booking and Medical Conditions**

      Plaintiff Pullano was sentenced to serve one year on a gross misdemeanor charge for writing bad checks.  Pullano was incarcerated in the Clark County Detention Center ("CCDC") between April 21, 2009, and June 16, 2009. NaphCare, Inc. ("NaphCare") is a private corporation contracted to provide medical care to inmates at CCDC.  Plaintiff suffers from various medical conditions including congestive heart

failure, hypertension, sleep apnea, osteoarthritis, and bipolar disorder.  (Dkt. nos. 3 at 6, 95 at 2, 95-Z.1, 95-Z.2, and 95.-Z.3.)   CCDC staff acknowledged these various conditions after a medical screening conducted during his initial booking.  (Dkt. no. 96-A at 33-34.)  NaphCare records demonstrate that NaphCare personnel knew of Pullano's various medical conditions on April 21, April 22, and April 24, 2009.   Pullano was dispensed medications consistent with preexisting unfulfilled prescriptions for the treatment of these medical conditions. (Dkt. nos. 95-A, 95-B, 95-E and *id.*)

During the booking process, CCDC staff explained how to request additional medical attention while inside the detention center.  (Dkt. no. 96-A at 50.)  Pullano was assigned to inmate module 4-L, an infirmary within CCDC that housed inmates with special medical needs.  (Dkt. nos. 95-A and 96-A at 70.)  The module is open, and all inmates are placed in a large room and assigned to cubicles.  (*Id.* at 35.)  While there, inmates are instructed to remain at the day room, except for meal times, pill calls, using the restroom, using the telephones, and walking to the guard desk.  (*Id.* at 35; dkt. no. 95-KK at 9-10.)  No exercise was allowed in the medical unit, and the exercise yard near the unit remained off limits.  (Dkt. no. 95-KK at 9-10.)

### B.    Medical requests

On April 22, 2009, the day after he was admitted, Pullano submitted a written medical request to receive medication prescribed to him before incarceration.  (Dkt. no. 96-B.)  A NaphCare employee responded to his request and informed Pullano that a psychiatrist needed to see him before those medications could be ordered.  (Dkt. no. 96-A at 49-50.)

On April 23, 2009, Pullano submitted a second medical request form complaining of dizziness, lightheadedness, and headaches.  (Dkt. nos. 96-C and 96-A at 50-51.)  Pullano wrote this request after an attending NaphCare nurse instructed him to do so earlier in the day.  A NaphCare employee responded to the request the same day and placed him on the psychological sick call list for that week. (Dkt. no. 96-A at 53.)

///

On April 24, 2009, Pullano submitted a third written medical request to the NaphCare medical staff.  (Dkt. no. 96-D.)  The request asked for aspirin, increased dosage of his Niaspan medication, provision of a continuous positive airwave pressure ("CPAP") machine to treat his sleep apnea, and a request for a cane due to his need for a knee joint replacement.  (*Id.*)  Pullano submitted this request after being told to do so by a nurse who Pullano talked to while inquiring about receiving aspirin to treat his heart condition, dizziness, and headaches.  (Dkt. no. 96-A at 55.)  NaphCare staff responded to his request the same day by informing Pullano that all medications are given according to physician's orders and that he must make arrangements to retrieve his own personal CPAP machine.  (Dkt. no. 96-D.)

On April 25, 2009, Pullano submitted his fourth medical request form to NaphCare medical staff.  (Dkt. no. 96-E.)  Pullano cited procedure in the CCDC inmate handbook in order to request a doctor's appointment to discuss his medical conditions, including cardiomyopathy, sleep apnea, and osteoarthritis.  A response was written on the same day informing Pullano that he was scheduled for an April 28, 2009, sick call, the appropriate setting to discuss his medical conditions.  He was also informed that he had an outstanding order dating April 21, 2009, allowing him to use his CPAP machine.  (*Id.*)  In his deposition, Pullano testified that this fourth medical request was submitted because he wished to again alert staff of his medical conditions, and to make clear that he had not received his cane, his CPAP machine, aspirin, or received any other medical treatment.  (Dkt. no. 96-A at 61.)  Pullano testified that, up until the receipt of this form, he had not felt that he had received adequate medical treatment.  This response assured him that he would soon receive treatment, and that his medical "merry-go-round" the past week would end.  (*Id.* at 62-63.)

On the same day, Pullano submitted a separate "Inmate Request/Grievance" form to the CCDC correctional staff.  (Dkt. no. 96-F.)  Inmates and prison staff generally refer to these forms as "kites."  Pullano requested a free non-toll call to a friend to enable him to secure funds to be placed on house arrest, per the instructions he had received from

another officer.[1]  Two days later, on April 27, 2009, Pullano received a written response from Sergeant Morrison advising him that free calls were not allowed, and that he should write a letter to his friend.  Pullano testified that he submitted this request after becoming frustrated with what he felt was the lack of appropriate responses to his medical concerns about dizziness and headaches.  (Dkt. no. 96-A at 64.)

On April 28, 2009, Pullano submitted his fifth medical request form.  (Dkt. no. 96-G.)  He requested a fiber supplement to ease constipation, and noted that he was instructed to do so by a doctor.  The responding NaphCare employee placed an order to receive fiber pills at pill call for 30 days.  Pullano testified that he did not receive the pill right away, and that it was "several days, maybe a week" before it was dispensed to him. (Dkt. no. 96-A at 67.)

On May 3, 2009, CCDC staff transferred Pullano out of medical housing to general population for the second time — the first transfer is described below.  Pullano claims that before being moved out, he had his blood pressure checked.  According to Pullano, the initial reading registered a very high blood pressure, so Defendant Judy Frank, a nurse, attempted to retrieve a lower reading by using several different blood pressure machines.  The lowest reading, 182/110, was ultimately used; Pullano alleges that to have been the cause of this transfer.  Plaintiff alleges that he was incarcerated at the Clark County Detention Center for 55 days, and only had his blood pressure monitored on 5 different occasions.  (*See* dkt. no. 95-KK at 7.)

Later, on May 10, 2009, Pullano submitted another medical request asking to take his medication at a different time than the scheduled pill call.  (Dkt. no. 96-J.)  Pullano explained in his deposition that his Trazadone medication causes drowsiness, and puts him to sleep.  Since the medication is dispensed at 7:00 pm, just prior to free time among the inmates, Pullano is awoken when the inmates return from their free time at

_____

[1]It appears from the record that Pullano and his counsel had expected a lesser sentence than what he received.  His lawyer immediately sought house arrest as an option for Pullano.  (Dkt. no. 96-A at 65.)

1   around 11:00 pm.  Pullano asked Dr. Hayes during his May 8, 2009, examination to

2   have his medication dispensed closer to 10:00 pm. Dr. Hayes told Pullano that he could

3   take the Trazadone medication at the 9:00 pm to 10:00 pm pain medication call.  On

4   May 12, 2009, NaphCare staff responded by informing Pullano that pill calls are done

5   only at regularly scheduled times.  (Dkt. no. 96-J.)

6        On May 15, 2009, Pullano submitted another medical request regarding swelling

7   he was experiencing, requesting medication that he had previously been prescribed to

8   treat the issue.  (Dkt. no. 96-L.)  A response was issued the same day saying that he is

9   scheduled for a sick call in which he can discuss these issues.  Pullano testified that he

10  received adequate care and was given a particular medication to respond to that issue.

11  (Dkt. no. 96-A at 114-15.)

12       On May 19, 2009, Plaintiff submitted another inmate grievance to Sergeant

13  Wesley complaining of treatment he received from Mary Brammer, another NaphCare

14  nurse.[2]  (Dkt. no. 96-M.)  In the grievance, he complained that Brammer singled him out

15  for poor treatment by giving him incorrect medication on 5 occasions, punishing him

16  during pill call by forcing him to sit and wait for his medications, not stirring some of his

17  medications, and other forms of punishment.  (*Id.*)  A response was issued the same

18  day, informing Pullano that he ought to be more cooperative with medical staff.  Pullano

19  did not appeal the decision, but felt it was not responsive to his concerns.  (Dkt. no. 96-A

20  at 117.)

21       On May 29, 2009, Pullano submitted a medical request notifying medical staff that

22  they had missed a psychiatric appointment scheduled with Pullano.  (Dkt. no. 96-N.)

23  Pullano testified that a member of the psychiatric staff had informed Pullano earlier in his

24  stay that should he experience any psychiatric or mental issue, he should let the staff

25  know promptly and they would see him before his next scheduled appointment.  (Dkt. no.

26  96-A at 130.)  Two weeks before May 29, Pullano had requested advanced psychiatric

27

28       [2]Pullano initially named Brammer as a defendant in the litigation, but failed to
serve Brammer with the suit.  Consequently, Brammer is not a party to the litigation.

1    care, but was told to wait until the end of the month for his scheduled appointment on

2    May 29, 2009.  Psychiatric staff then missed his appointment, and Pullano subsequently

3    wrote this request.  (*Id.* at 130-32.)  Staff responded to his request informing Pullano that

4    his appointment will be rescheduled.

5          **C.    Cane confiscation**

6          As noted, on April 24, 2009, Pullano requested a cane for use because of his

7    need for a knee joint replacement.  Pullano was provided a cane in late April 2009 to

8    assist him in walking.  (Dkt. no. 96-A at 72-73.)  The NaphCare order for a cane was

9    dated April 28, 2009.  (Dkt. no. 95-L.)

10         On May 1, 2009, Pullano was moved out of the medical 4-L module and placed in

11   the 5N general population module.  (Dkt. no. 96-H.)  Pullano had spoken earlier with

12   Defendant Nancy Goodman, who told him that she was unhappy about his constant

13   medical requests and his requests for aspirin.  According to Pullano, he was "out of the

14   blue" transferred out of the medical unit after these conversations.  Pullano described

15   these conversations as "not argumentative" and "straightforward and short."  (Dkt. no.

16   96-A at 68.)  Pullano further described how Defendant Joseph Venturina, a nurse, had

17   instructed another attending nurse practitioner that Pullano should be moved out of

18   medical housing.  According to Pullano, the nurse practitioner refused, citing Pullano's

19   extensive medical needs.  Venturina contested Pullano's stay at medical housing and

20   bent over and told Pullano that, "I want you out of here," and instructed Pullano to "get

21   out of my face."  (Dkt. no. 68-A at 70.)

22         That day, the CCDC 4-L supervisor, Defendant Cesar Escobar, instructed Pullano

23   to pack up his belongings to prepare for a transfer to general population.  (Dkt. no. 68-A

24   at 75.)  Escobar also confiscated Pullano's cane before the transfer.  (*Id.*)  When Pullano

25   asked how he would move around, Escobar told Pullano that he would be forced to do a

26   "pimp walk."  (*Id.*)  Pullano testified that he was very anxious at this point because of his

27   transfer, and he immediately filed a grievance.  He was seen "in a matter of minutes" by

28   the floor sergeant on duty.  (Dkt. no. 68-A at 74.)  The floor sergeant responded quickly

1    to Pullano's concerns, was informed that Pullano uses a cane, and transferred Pullano

2    back that same evening.  (Dkt. no. 68-A at 82-83.)   Pullano testified that the transfer

3    back to the medical unit was due to the cane confiscation.  (*Id.* at 83.)

4           The next morning, on May 2, 2009, Pullano discussed having his cane returned

5    with Goodman.  She refused his request for a cane, even after Pullano informed her that

6    he had before been issued that cane.  (Dkt. no. 68-A at 83-84.)  According to Pullano

7    and other inmates, she responded by saying, "You don't understand. It's not up for

8    debate. You don't use a cane."  (*Id.* at 83; dkt. nos. 95-D, 95-KK at 6, and 95-R.)

9    Pullano responded by saying that he would write a kite to request a cane.  Goodman told

10   him not to write any more kites.  Officer Mitchell, who witnessed the encounter, ordered

11   Pullano back to his bunk.

12          Between May 2 and May 13, 2009, Pullano made many verbal requests and filed

13   medical requests/grievances regarding the return of his cane.  Only after contacting an

14   attorney and filing an escalated grievance to the 4-L Floor Sergeant was his cane

15   returned.  (*See* dkt. no. 95-KK at 6.)

16          **D.**    **CPAP Machine**

17          In April 2009, Pullano complained about lack of access to his CPAP machine to

18   treat sleep apnea.  Pullano arranged for the delivery of his CPAP machine from his

19   residence in Indiana.  The machine arrived at CCDC on May 1, 2009.  (Dkt. no. 95-EE.)

20   On May 2, 2009, Pullano sent a kite to CCDC's Chaplain asking for help retrieving his

21   CPAP machine, which had not been delivered to Pullano, and for access to three

22   documents from prior doctor's visits that would assist requesting medical care.  (*See* dkt.

23   no. 95-C.1.)

24          On May 4, 2009, Pullano sent another medical kite stating his need for his CPAP

25   machine.

26          On May 5, 2009, Pullano submitted an inmate grievance to CCDC officials again

27   asking for his CPAP machine, which he noted was received on May 1, 2009.  (Dkt. no.

28   96-I.)  Pullano was told shortly thereafter that his CPAP machine had been sitting in an

1    examination room in the medical module and had been there for at least a few days.

2    (Dkt. no. 95-KK at 8 and 96-A at 98.)

3         During a scheduled medical examination on May 8, 2009, Pullano's attending

4    doctor, Dr. Hayes, asked Defendants Goodman and Venturina if they knew where

5    Pullano's CPAP machine was located.  (Dkt. no. 95-KK at 8.)  They said no.  Pullano

6    then pointed out the machine, which had been left in the examination room with its

7    original shipping box.  (*Id.*)    According to Pullano, Dr. Hayes ordered Goodman and

8    Venturina to set up the CPAP machine.  Pullano also testified that Dr. Hayes ordered

9    regular exercise for him in order to treat his cardiomyopathy, and ordered Pullano place

10   himself on a self-imposed diet.  (*Id.* at 8-9.)

11        On May 9, 2009, a response was made to Pullano's May 5, 2009, grievance

12   saying that Pullano was informed that he is responsible for retrieving any missing parts

13   of his machine.  (Dkt. no. 96-I.)  Pullano was told by a fellow inmate that the inmate

14   overheard various Defendants saying that a power cord could not be located for

15   Pullano's CPAP machine.  (Dkt. no. 95-KK at 9.)  Pullano called home, and was assured

16   that the power cord was shipped in the box.  Having not yet received his CPAP machine,

17   Pullano wrote a medical request on May 10, 2009, inquiring about whether the rumor

18   regarding the power cord was true.[3]   After filing the request, Pullano testified that

19   Defendant Nancy Goodman went back to his cubicle and told him that he had already

20   been informed of the missing power cord.  (Dkt. no. 96-A at 107-08.)  She told him that

21   he should not write any more requests.

22   ///

23   ///

24   ///

25   ///

26   _____

27        [3]This request was not in the record before the Court.  Pullano testified in his
     deposition that he does not have a copy of this request because it was not returned to
28   him.  He testified, however, that he kept personal notes on all of his medical requests.
     (Dkt. no. 96-A at 107.)

In addition to the medical request, Pullano submitted a CCDC inmate request/grievance on May 10, 2009,[4] explaining that he feared retaliation out of his attempts to redress various problems with his medical care.  (Dkt. no. 96-K.)  The request documents his transfers out of medical housing, the cane confiscation, withholding of his CPAP machine, orders for him not to write new kites, statements about prior discussions regarding his CPAP parts which Pullano believed were false, and several mistaken provisions of medications by medical staff.[5]  Pullano testified that these various events placed him in a precarious position, as he sensed that he was being singled out for poor treatment and wanted to ensure that he was not retaliated against, given his medical conditions.  (Dkt. no. 96-A at 107-10.)  After writing this request, Sergeant Wesley met with Pullano and told Pullano that she would follow up with his grievances and resolve issues with medical staff.  (*Id.* at 112-13.)

**E.    Exercise**

On June 6, 2009, Plaintiff submitted a medical request complaining about not being able to perform doctor-ordered physical exercise in the medical housing unit.  (Dkt. no. 96-P.)  He testified that both his personal doctor and the CCDC doctor had ordered physical exercise for him, and he requested cardio exercise in the form of walking between the aisles of the medical unit.  (*Id.*)

Before submitting this request, Pullano alleged that he discussed his exercise needs with a number of CCDC officers.  From May 1 to May 12, 2009, Pullano made several inquiries to the guards and inmates about exercise, since his presiding doctor ordered exercise daily.  (*See* 95-KK at 9.)  They all responded that exercise within the medical unit is prohibited and that the adjacent exercise yard is off limits.  (*See dkt. no.*

_____

[4]The request was dated May 13, 2009, but Pullano testified that the date was actually May 10, 2009, and was an inadvertent mistake based on the difficulty of ascertaining the date while incarcerated. (Dkt. no. 96-A at 106, 110).

[5]Pullano wrote that medications were dispensed mistakenly several times.  He thought they were inadvertent mistakes not done purposely, but he wrote in the request that such mistakes were dangerous.

1   95-KK at 9-10.)  Dr. Hayes, in his May 8, 2009, medical examination of Pullano, ordered

2   Pullano to seek regular exercise to treat his medical conditions.  Pullano testified that Dr.

3   Hayes knew that exercise was not allowed but that Dr. Hayes told Pullano to find a way

4   to do so anyhow.  (Dkt. no. 96-A at 138, 140.)

5        After the medical examination, Pullano asked Defendant Wolfe, a CCPD officer,

6   about the availability of exercise and his doctor's orders.  (Dkt. no. 96-KK at 9.)  Wolfe

7   responded that no exercise was available and the exercise yard attached to the medical

8   housing unit was "off limits."  (*Id.*)  He reiterated CCDC's policy that during free time

9   inmates are only allowed to walk to the phones, guard desk, showers, or the day room

10  where they must take a seat.  (*Id.* at 10.)  Wolfe would regularly make announcements

11  concerning free time policy to the inmates.  (*Id.* at 10; dkt. nos. 96-R and 96-W.)  An

12  affidavit of Kevin Davis, a former medical unit inmate at the CCDC, describes how Wolfe

13  did not allow inmates to go to the exercise yard in part because past inmates were

14  caught slipping notes to an adjacent female unit during their time on the yard.  (Dkt. no.

15  96-W.)  Wolfe then ordered that medical unit inmates not have access to the yard, and

16  his subordinates would enforce this rule when Wolfe was not present.  (*Id.*)

17       According to Pullano, he had sought grievance forms to complain about the lack

18  of exercise, but was rebuffed.  Pullano in his deposition testimony describes one incident

19  where he attempted to procure a grievance form from Defendant Arb, another CCDC

20  officer.  Arb did not provide him with a grievance form to complain about the lack of

21  exercise as it would be a "waste of paper" and would not result in a change to the policy.

22  (Dkt. no. 96-A at 145-46.)

23       Pullano was able to secure a grievance form, and submitted it on June 6, 2009.

24  The form response denied Pullano's request, informing him that he must seek a doctor's

25  order about exercise and that the medical housing unit is currently unable to

26  accommodate his request.  (Dkt. no. 96-P.)  Unhappy with the response, Pullano

27  decided to send a typed letter directly to the Deputy Chief in charge of the Las Vegas

28  Municipal Police Department's Detention Services Division.  (Dkt. no. 96-A at 147-48.)

Pullano testified that he did so because he wanted to prevent interception of the grievance request by the various officers who had denied his request for exercise earlier. He testified that past grievances about medical treatment were read by the subjects of the grievances, which caused him problems and subjected him to retaliation.   (*Id.*) Pullano also testified that he did not request a medical order from Dr. Hayes, because he understood Dr. Hayes' brief consultation with him to mean that Dr. Hayes had no authority to provide Pullano with the exercise that he knew to be prohibited at the medical unit.  (*Id.* at 150.)

### F.    Lawsuit

Pullano submitted his last medical request on June 14, 2009, requesting left knee joint replacement surgery because his knee brace had failed to prevent pain in his knee. (Dkt. no. 96-Q.)  Medical staff responded by placing him on the sick call, but Pullano was released on house arrest on July 16, 2009, before a scheduled appointment.  (Dkt. no. 96-A at 153-54.)

Pullano filed this action *in forma pauperis* on June 4, 2010.  He alleges various violations of his civil rights based on the conduct of the nurses and guards at CCDC. Specifically, Pullano contends that his First Amendment rights were violated when his attempts to file grievances were blocked, diverted, denied, or otherwise limited by CCDC and NaphCare staff.   Pullano also alleges that his Eighth Amendment rights were violated when, during various periods of his incarceration, staff members withheld his CPAP device needed to treat his sleep apnea, deprived him use of a medically necessary cane, failed to give him appropriate medication, temporarily removed him from medical housing, failed to monitor his medical condition, failed to give certain treatments, did not allow him sufficient exercise, exposed him to dangerous conditions, and failed to provide him adequate lighting, toilet facilities, and sleep.

On July 8, 2011, the Court issued an order granting in part and denying in part Defendants' Motions to Dismiss.  (Dkt. no. 83.)  Pullano's Eighth Amendment claims against Defendants Judy Frank, Elias S. Nolasco, Joseph Venturina, and Nancy

1 Goodman ("the NaphCare defendants") survived, as did his Eighth Amendment claims

2 against Defendants Escobar and Wolfe ("the CCDC defendants").   Judgment on the

3 pleadings for Defendants CCDC, Sheriff Gillespie, and Former Deputy Kirkegard was

4 entered.   Pullano's First Amendment claims were dismissed, as were his Eighth

5 Amendment claims against NaphCare, Inc. and the NaphCare defendants in their official

6 capacity.

7    On September 9, 2011, Pullano filed his Motion for Partial Summary Judgment

8 against all remaining defendants except for Nolasco.  (Dkt. no. 95.)  Shortly thereafter,

9 on September 16, 2011, the CCDC defendants filed their own Counter-Motion for

10 Summary Judgment.  (Dkt. no. 96.)  The NaphCare defendants responded to Pullano's

11 Motion on September 26, 2011, and also filed a Counter-Motion for Summary Judgment

12 against Pullano.  (Dkt. nos. 108 and 122.)

13 **II.** **LEGAL STANDARD**

14    The purpose of summary judgment is to avoid unnecessary trials when there is no

15 dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

16 F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings,

17 the discovery and disclosure materials on file, and any affidavits "show there is no

18 genuine issue as to any material fact and that the movant is entitled to judgment as a

19 matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine"

20 if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for

21 the nonmoving party and a dispute is "material" if it could affect the outcome of the suit

22 under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

23 Where reasonable minds could differ on the material facts at issue, however, summary

24 judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

25 1995), *cert. denied*, 516 U.S. 1171 (1996).  "The amount of evidence necessary to raise

26 a genuine issue of material fact is enough 'to require a jury or judge to resolve the

27 parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897,

28 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89

1   (1968)).  In evaluating a summary judgment motion, a court views all facts and draws all

2   inferences in the light most favorable to the nonmoving party.  *Kaiser Cement Corp. v.*

3   *Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

4       The moving party bears the burden of showing that there are no genuine issues

5   of material fact.  *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In

6   order to carry its burden of production, the moving party must either produce evidence

7   negating an essential element of the nonmoving party's claim or defense or show that

8   the nonmoving party does not have enough evidence of an essential element to carry its

9   ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

10  F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party satisfies Rule 56's

11  requirements, the burden shifts to the party resisting the motion to "set forth specific

12  facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  The

13  nonmoving party "may not rely on denials in the pleadings but must produce specific

14  evidence, through affidavits or admissible discovery material, to show that the dispute

15  exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do

16  more than simply show that there is some metaphysical doubt as to the material facts."

17  *Orr v. Bank of America*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).

18  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

19  insufficient." *Anderson*, 477 U.S. at 252.

20      Further, "when parties submit cross-motions for summary judgment, '[e]ach

21  motion must be considered on its own merits.'"  *Fair Hous. Council of Riverside County,*

22  *Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting William W.

23  Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D.

24  441, 499 (Feb. 1992) (citations omitted).  "In fulfilling its duty to review each cross-motion

25  separately, the court must review the evidence submitted in support of each cross-

26  motion." *Id.*

27  ///

28  ///

13

1    **III.    DISCUSSION**

2         Pullano's surviving claims against the various defendants can be divided into two

3    main categories: violations of his Eighth Amendment right to adequate medical care, and

4    violations of his Eighth Amendment right to be free of cruel and inhumane prison

5    conditions.  He seeks summary judgment on claims related to inadequate medical care

6    and the lack of exercise provided to him during his incarceration.  Defendants filed cross-

7    motions for summary judgments on the same claims.  In addition, the CCDC Defendants

8    seek summary judgment on Counts VI and VII concerning non-exercise related

9    conditions of confinement claims.  The CCDC Defendants also seek summary judgment

10   on Pullano's already-dismissed First Amendment claims, as well as Eighth Amendment

11   claims relating to discourteous conduct which do not appear in Pullano's Complaint.

12   These claims are addressed in this Section in order, in addition to a preliminary

13   challenge raised by the NaphCare Defendants.

14        **A.    Compliance with Local Rule 56-1**

15        The NaphCare Defendants ask the Court to deny Pullano's Motion on the grounds

16   that he did not comply with Local Rule 56-1's requirement that a summary judgment

17   motion be accompanied with a statement of material facts.  While Pullano's Statement of

18   Material Facts (dkt. no. 95 at 19-22) fails to appropriately list each material fact as

19   required by Local Rule 56-1, the Court's obligation to consider *pro se* summary judgment

20   motions "with less than strict literalness" requires that this pleading defect not be used to

21   invalidate Pullano's otherwise proper filing.  *See Thomas v. Ponder*, 611 F.3d 1144,

22   1150 (9th Cir. 2010) (quoting *Jacobsen v. Filler*, 790 F.2d 1362, 1365 n.4 (9th Cir. 1986).

23   The Court will not deny Pullano's Motion on this basis.

24        **B.    Eighth Amendment Inadequate Medical Care Claims**

25             **1.    Standard of Review**

26        Although prisoners may be deprived of some of their rights fundamental to liberty,

27   they "retain the essence of human dignity inherent in all persons."  *Brown v. Plata*, 131

28   S. Ct. 1910, 1928 (2011).  The Eighth Amendment protects this dignity in its prohibition

1    against cruel and unusual punishment.   Because society takes from prisoners their

2    liberty to provide for themselves, they become dependent on the State for shelter, food,

3    clothing, and medical care.   "A prison that deprives prisoners of basic sustenance,

4    including adequate medical care, is incompatible with the concept of human dignity and

5    has no place in civilized society."  *Id.*

6        "[T]he government has an obligation to provide medical care for those whom it

7    punishes by incarceration," *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir.

8    1988), and cannot be deliberately indifferent to the medical needs of its prisoners. *See*

9    *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   "[T]he appropriate inquiry when an inmate

10   alleges that prison officials failed to attend to serious medical needs is whether the

11   officials exhibited deliberate indifference."  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

12       Deliberate indifference to a prisoner's serious medical needs violates the Eighth

13   Amendment.  *Estelle*, 429 U.S. at 104.  Prison doctors, medical staff, or prison guards

14   can all be liable for Eighth Amendment violations.  *Id.*  The Supreme Court has identified

15   two forms of deliberate indifference: when prison officials deny, delay or intentionally

16   interfere with medical treatment, or by the way in which prison physicians provide

17   medical care.  *See Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing

18   *Estelle*, 429 U.S. at 104-05).

19       In the Ninth Circuit, the test for deliberate indifference consists of two parts.

20   *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), *overruled on other grounds by WMX*

21   *Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  First, the plaintiff must

22   show a "serious medical need" by demonstrating that failure to treat her or his condition

23   could result in further significant injury or the unnecessary and wanton infliction of pain.

24   *Id.*  A serious injury is not the type of "routine discomfort [that] is 'part of the penalty that

25   criminal offenders pay for their offenses against society.'"   *Hudson*, 503 U.S. at 9

26   (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  "The existence of an injury

27   that a reasonable doctor or patient would find important and worthy of comment or

28   treatment; the presence of a medical condition that significantly affects an individual's

daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin*, 974 F.2d at 1059-60 (citations omitted).

Second, the plaintiff must demonstrate that the defendant's response to the need was deliberately indifferent by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations and citations omitted). The requirement of a purposeful act/failure to respond is intended to preclude a finding of deliberate indifference for accidents or inadvertent failures to provide adequate medical care. *Estelle*, 429 U.S. at 105.   Mere negligence does not rise to an Eighth Amendment violation.   *Hutchinson*, 838 F.2d at 394.  In order to demonstrate harm caused by the indifference, a prisoner need not show that the harm was substantial, but such a showing would provide additional support for the inmate's claim of deliberate indifference. *McGuckin*, 971 F.2d at 1060.

Once these requirements are met, the factfinder must determine whether the defendant was deliberately indifferent to the prisoner's medical needs.  *McGuckin*, 971 F.2d at 1060.  "[T]he more serious the medical needs of the prisoner, . . . the more likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant." *Id.* at 1061.  A finding that the defendant's neglect was isolated weighs against a finding of deliberate indifference, while a repeated failure to treat an inmate or a single egregious failure supports such a finding.  *Id.* at 1060-61.

With the legal framework of Pullano's case in mind, the Court turns to analyzing his claims.   The alleged violations of Pullano's Eighth Amendment right to adequate medical care can be roughly categorized into the following categories: failure to provide his CPAP machine; confiscation of his cane; transfer out of medical housing; lack of exercise privileges; failure to dispense medications; deliberate low readings of blood pressure; and other miscellaneous inadequacies in medical care.  The Court will discuss these in order.

### 2.    Failure to provide CPAP machine

Pullano charges Defendants Venturina, Frank, and Goodman with failing to provide him his ordered CPAP machine.[6]  The CPAP machine was used to treat Pullano's sleep apnea.  On the third day after booking, Pullano submitted a medical request for the machine.  The response informed Pullano that he must make his own arrangements to bring his CPAP machine from home.

Under the Ninth Circuit's test, the first question to ask in examining these claims is whether Pullano had a "serious medical need" that the CPAP remedied.  According to Pullano's Motion, the CPAP machine treated his severe sleep apnea.  The NaphCare Defendants do not contest the seriousness of sleep apnea, nor does their medical expert, Dr. Robert Jones.  Therefore, for the purposes of this discussion, the Court assumes the seriousness of sleep apnea.

The Court must next determine whether Pullano met his burden in demonstrating that Defendants exhibited a deliberate indifference to that serious medical need.  To do so, he must show (a) a purposeful act or failure to respond to his pain or possible medical need and (b) harm caused by the indifference.

The Court holds that no genuine issue of material fact exists on the question of whether Defendants' failure to provide Pullano with a CPAP machine to treat his sleep apnea constituted a purposeful act or failure to respond.  The undisputed facts before the Court demonstrate that Defendants Venturina, Frank, and Goodman purposely failed to respond to Pullano's serious need for his CPAP machine in light of the seriousness of Pullano's medical condition, the numerous notices they received of the machine laying idle in the medical unit, and the general disinterest that characterized their response.

---

[6]The NaphCare Defendants object to Pullano's request for summary judgment against Frank on the CPAP delay, pointing out that his Complaint did not allege that Frank was in any way responsible for the delay. This claim is meritless, since Count II of Pullano's Complaint specifically alleges Eighth Amendment violations against "the Defendants," of which Frank is one.  (Dkt. no. 3 at 14.)  That discovery might yield precisely who among the defendants is responsible for any particular action is unsurprising, since plaintiffs — particularly those proceeding *pro se* — do not need to plead facts with neat precision.

1    The NaphCare Defendants knew of Pullano's request for a CPAP machine by April 24,

2    2009.  After Pullano made arrangements to have his own machine sent to him (even

3    though some evidence in the record suggests that NaphCare provided other inmates

4    with NaphCare-owned CPAP machines, *see* dkt. nos. 95-KK at 2 and 95-R[7]), the

5    machine lay dormant for days until Pullano had to identify the machine to Defendants

6    himself.   The NaphCare Defendants do not contest the fact that Pullano's CPAP

7    machine lay idle for days after its receipt at the CCDC.    Though the NaphCare

8    Defendants argue that a roughly week-long delay between Pullano's power cord request

9    from his friend in Indiana and Pullano's eventual receipt of the CPAP machine is not

10   unreasonable, this reasoning masks the amount of days that the machine was in the

11   custody of CCDC without being provided to Pullano and minimizes the seriousness of

12   the machine to Pullano's health.  Had they provided Pullano with the machine earlier, he

13   would have had the opportunity to request the power cord earlier.  Not providing Pullano

14   with a NaphCare-owned CPAP machine, not providing the machine after its receipt,

15   ignoring three requests for the machine, and failing to provide it when it was easily

16   accessible all demonstrate Defendants' deliberate indifference to Pullano's medical

17   need.

18        There is, however, insufficient evidence to conclude that Pullano suffered harm as

19   a result of the sleep apnea.  In support of their position that no harm resulted from the

20   delay in providing the CPAP machine, the NaphCare Defendants rely on two pieces of

21   evidence: Pullano's admission that he had not been diagnosed by a medical provider

---

23   [7]The NaphCare Defendants argue that the affidavits of Kevin Davis and Frank
     Blackburn should be disregarded since they were not witnesses nor signed in the
24   presence of a notary public.  The affidavits were signed and written expressly to conform
     to NRS 208.165, which provides that "[a] prisoner may execute any instrument by
25   signing his or her name immediately following a declaration 'under penalty of perjury'
     with the same legal effect as if he or she had acknowledged it or sworn to its truth before
26   a person authorized to administer oaths."   Although the sufficiency of evidence in
     support of summary judgment is a matter of federal, not state, law, the Court considers
27   the affidavits as they are sworn by their authors and relay events and facts in the
     personal knowledge of the affiants.  *See* Fed. R. Civ. P. 56(c)(4).  For this reason, the
28   affidavits of Davis and Blackburn, as well as Pullano, are considered in determining
     summary judgment.

1   with any medical conditions caused from not using a CPAP machine; and Dr. Jones'

2   expert review of Pullano's medical records.[8]   Pullano himself did not provide any

3   evidence of harm arising out of this episode.   In the absence of any evidence showing

4   that Pullano suffered harm from the withholding of his CPAP machine, the Court finds

5   that Pullano cannot satisfy the second requirement of the deliberate indifference test.

6   Accordingly, the Court cannot grant summary judgment in Pullano's favor.

7          Defendants Frank, Goodman, and Venturina, in response to Pullano's Motion,

8   counter-moved for summary judgment on all claims.   They seek summary judgment on

9   the CPAP issue principally by arguing that the delays in providing Pullano his CPAP

10  machine were not unreasonable, and that Pullano has not proffered evidence showing

11  harm suffered as a result of these delays.   While the Court has concerns about

12  Defendants' delays in failure to provide Pullano's CPAP machine in a timely manner,

13  their summary judgment on this issue is nonetheless granted on the grounds that

14  Pullano has failed to show evidence of harm.

15                    **3.     Confiscation of cane**

16         Pullano seeks summary judgment against Defendants Goodman and Escobar

17  arising out of the confiscation of his medically-ordered cane.   Defendant Goodman in her

18  Counter-Motion argues that the cane was discharged from Pullano on May 3, 2009, after

19  a physician's assistant noted that his ambulation was steady.   (*See* dkt. no. 96-A at 43.)

20  For that reason, Goodman argues that she was not responsible for the cane's

21  confiscation.   Goodman also argues that Pullano did not need his cane, since he was

22  required to walk only short distances during his time in detention.   Lastly, Goodman

23  points out that Pullano did not offer evidence of harm suffered as a result of the cane's

24  _____

25         [8]The expert medical opinion first filed by the NaphCare Defendants appeared to
     have an erroneous listing of documents upon which Dr. Jones relied in forming his
     medical opinion.  Pullano, in his Response, pointed out the discrepancies (*see* dkt. no.
26   123 at 9-10), and the NaphCare Defendants filed a Notice of Errata with a corrected
     version of the medical report (*see* dkt. no. 113).  This Notice of Errata is the subject of
27   Pullano's Motion to Strike (dkt. no. 115), which is decided in a separate order.  For the
     purposes of this Order, the Court relies on the corrected medical report, and finds it
28   credible in light of the circumstances.

1   confiscation, and noted that Dr. Jones testified that the cane confiscation did not result in

2   any injury to Pullano.  Defendant Escobar in his Counter-Motion also argues that he did

3   not cause the confiscation of Pullano's cane, and that other CCDC personnel promptly

4   returned his cane after Pullano made inquiries about it.

5          For the same reasons outlined in the Court's discussion of the CPAP machine,

6   Pullano cannot succeed on summary judgment because he has failed to demonstrate

7   harm resulting from the cane's confiscation.  NaphCare staff provided Pullano a cane

8   around April 28, 2009, in response to medical requests Pullano made in light of his weak

9   knee and degenerative joint disease.  The NaphCare Defendants do not contest the

10   seriousness of Pullano's medical conditions with respect to his knee; the Court thus

11   holds as serious the medical need for a cane.  *See, e.g.*, *Rosales v. Couglin*, 10 F.

12   Supp. 2d 261, 269 (W.D.N.Y. 1998) (seizure of prescribed cane can give rise to Eighth

13   Amendment violation); *Hemmings v. Gorczyk*, 134 F.3d 104, 108-09 (2d Cir. 1998)

14   (holding that seizure of crutches can state an Eighth Amendment claim).

15          A genuine issue of material fact exists as to whether Defendants Goodman and

16   Escobar acted purposefully when confiscating Pullano's cane.  According to Pullano,

17   Escobar's statements that Pullano would be forced to do a "pimp walk" in general

18   population without his cane demonstrate, at the very least, deliberate indifference toward

19   the seriousness of Pullano's conditions.  Upon his return to the medical housing unit,

20   Defendant Goodman's statements that Pullano's cane use was "not up for debate" also

21   exhibits an intentional withholding of Pullano's cane notwithstanding prior orders to

22   provide him with the cane.[9]  However, the NaphCare Defendants point to a record made

23   _____

24          [9]The NaphCare Defendants challenge the propriety of Blackburn's affidavit by
arguing that Goodman's statements, as heard by Blackburn, are inadmissible hearsay
25   under the Federal Rules of Evidence.  Goodman told Pullano that he does not use a
cane and he would have to do without it.  This statement can be considered by the
26   Court, as it is not offered to assert the truth of the matter contained therein.  *See* FRE
801(c)(2).  Its relevance is premised on Goodman's making the statement, not based on
27   whether the statement is itself true or false.  *See United States v. Payne*, 944 F.2d 1458,
1472 (9th Cir. 1991) (holding that a statement not offered for truth of the matter asserted
28   but instead to show its effect on the listener was "properly treated as non-hearsay").

by a physicians' assistant on May 3, 2009, observing that Pullano's ambulation was steady and apparently showing that the cane would be withdrawn. The withholding of the cane could have been the result of this examination, even though it post-dates the cane's first confiscation and Defendant Goodman's statements.

Moreover, Pullano failed to provide any evidence that he suffered harm as a result of the confiscation. The only evidence submitted is the expert testimony of Dr. Jones who concluded that the deprivation of the cane did not, in his expert opinion, lead to any medical harm. Thus, on this record, Plaintiff has failed to meet his burden on summary judgment, and his request as to the cane confiscation is denied. Defendants Goodman and Escobar's Counter-Motion on this issue is granted.

### 4.     Transfer From Medical Housing

Pullano also complains in his Motion about transfers from medical housing into general population at the hands of Defendants Venturina, Frank, Goodman, and Escobar. Defendants argue that the transfers out of the medical infirmary were medically insignificant, and that Pullano did not allege that he suffered harm as a result of the transfers.

The record before the Court demonstrates that Pullano's medical conditions are serious, and that medical housing was necessary to prevent serious harm. Defendants do not contest the seriousness of Pullano's conditions, which include congestive heart failure, hypertension, sleep apnea, osteoarthritis, degenerative joint disease, and bipolar disorder. That he was ordered medical housing by the CCPD and NaphCare during the duration of his stay confirms the seriousness of his condition.

However, there is a genuine issue of material fact as to whether the NaphCare Defendants purposefully transferred Pullano out of the medical infirmary. He was first assigned to the medical unit upon booking. Pullano then alleges that, after numerous requests were filed, he was transferred out of the medical unit on May 1. He attributes this transfer in part due to a conversation he had with Defendant Goodman regarding his medical requests. He also pointed to Defendant Venturina's earlier statement to another

nurse requesting he be transferred out of medical housing, presumably because of his constant medical requests.  Defendants have not articulated any legitimate basis for Pullano's transfers from medical housing.  There is no indication that the seriousness of Pullano's medical conditions subsided for any period of time to necessitate transfer.  The same medical record created by a physicians' assistant concerning Pullano's cane confiscation appears also to order Pullano to general population.  (*See* dkt. no. 108-A at 43. (stating "To GP").)  To the extent that the NaphCare Defendants suggest that they were not responsible for the transfer, this record lends some support for their position.

Nevertheless, Pullano fails to demonstrate harm arising out of his medical transfers.  Even though his brief transfers out of medical housing flouted a serious medical need, Pullano has not demonstrated any harm suffered as a result, and thus cannot succeed on an Eighth Amendment claim.  Conversely, Defendants Venturina, Frank, Goodman, and Escobar filed cross-motions for summary judgment, supported by medical expert testimony, arguing that the transfers did not result in any harm.  Faced with the medical expert testimony on one side, and a lack of any evidence on the other side, the Court grants summary judgment in favor of Defendants on this issue.

### 5.    Mistaken and denied dispense of medication

Pullano also seeks summary judgment against Defendants Goodman and Venturina arguing that they made numerous mistakes in his medication dispersals, at times denied him medication, and scheduled him to non-medical psychological sick call when he needed medical attention.  Specifically, Pullano alleges that Defendant Venturina purposely ignored his medical requests and purposely misdirected him to a scheduled non-medical, psychological sick call.  Pullano also alleges that Defendant Goodman denied him medications and caused his sleep medication to be dispensed at 7:00 pm instead of 10:00 pm.

Defendants Goodman, Venturina, and Nolasco filed counter-motions for summary judgment on this issue.  Though Pullano did not originally seek summary judgment against Nolasco, Nolasco moved for summary judgment on the grounds that the only

1  remaining allegations against him – forcing Pullano to sit during the dispensing of
2  medications to inmates – is not an Eighth Amendment violation.

3          Pullano's Motion fails on these issues for several reasons.  First, it is not clear
4  from the briefing whether Goodman and Venturina's alleged conduct occurred in
5  response to a serious medical need.  Goodman's denial of Pullano's medications at the
6  7:00 pm hour arguably does not rise to the standard of serious need, but might rather be
7  characterized as a "routine discomfort."  *See Hudson*, 503 U.S. at 9.  The need for the
8  later dispensing was to allow Pullano to sleep through the hustle of returning inmates
9  that would awaken him at 11:00 pm.  Without any demonstration that his sleep at 7:00
10 pm is particularly important for his medical conditions, or that he would not have been
11 awoken but for the late dispersal, this need is not the kind that the Court can
12 characterize as serious.  Further, Pullano has again failed to demonstrate medical harm
13 resulting from this decision.  As a result, he cannot meet his burden against Goodman
14 on these allegations.

15         However, Pullano's allegations about Venturina ignoring his medical requests and
16 scheduling non-medical psychological examinations are serious.  Pullano alleges that
17 his April 23, 2009, request for medical attention regarding headaches, lightheadedness,
18 and dizziness were not appropriately responded to, since Defendant Venturina's
19 response was to place him on psychological sick call rather than medical sick call.  Since
20 the NaphCare Defendants knew about Pullano's many serious medical conditions, failing
21 to respond appropriately to serious symptoms like the ones outlined in his April 23, 2009,
22 request for medical care can be the basis for an Eighth Amendment violation.  Further,
23 the evidence demonstrates a purposeful act on the part of Venturina in assigning
24 Pullano non-medical psychological sick call.  Pullano fails, however, to demonstrate
25 medical harm caused by not seeing a medical doctor in response to his April 23, 2009,
26 request.

27         Lastly, Defendant Nolasco seeks summary judgment against Pullano.  Pullano's
28 allegation against Nolasco concerns Nolasco allegedly taking Pullano out of the medical

lines during pill call.  Nolasco's summary judgment request is granted, since Pullano has failed to demonstrate any harm resulting out of this incident.  In addition, it is not clear from Pullano's briefing that a serious medical need was implicated by his being removed from the pill line.  Pullano, in his Reply, argues against summary judgment on the ground that Nolasco's actions were done in retaliation to Pullano's grievances about his treatment by Nurse Brammer.  Since no Eighth Amendment violation can be sustained based on these facts, Nolasco's Motion for Summary Judgment is granted.

### 6.    Low blood pressure reading

Pullano further alleges that Defendant Frank violated his Eighth Amendment rights by purposefully recording the lowest blood pressure reading during an examination on May 3, 2009, which resulted in his transfer from medical housing to general population.   The record cited by Pullano in support of his allegation is a document entitled "Progress Notes" that documents various medical officials' examinations of Pullano, including a 182/110 blood pressure reading conducted on the same day by Carla Sams.   The notes also state that Pullano's blood pressure was retaken by Sams again and recorded as 140/90.   Beyond Pullano's Motion and his declaration, there is no indication that Defendant Frank was responsible for the complained-of blood pressure reading, and no evidence to support Pullano's argument that Frank sought to purposely manipulate his blood pressure reading.   Pullano also does not demonstrate that the faulty reading led to any harm beyond medical transfer. For this reason, Pullano's Eighth Amendment claims against Frank are denied, and Frank's counter-motion is granted.

### C.    Eighth Amendment conditions of confinement claims

#### 1.    Legal standard

In addition to providing adequate medical care for inmates, the Constitution requires that the State "provide humane conditions of confinement."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "An Eighth Amendment claim that a prison official has deprived inmates of humane conditions must meet two requirements, one objective and

one subjective." *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1995). "Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities. The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference." *Id.* (citations omitted).

### 2.   Lack of Exercise

Pullano seeks summary judgment against Defendant Wolfe for failing to provide Pullano with adequate access to exercise during his time in CCDC. General population inmates have access to an exercise yard, but those inmates housed at the medical unit could not access an adjacent yard. Pullano represented that he made numerous requests to seek additional exercise, and was foiled in his attempt to receive grievance forms to make such a request. He was able to receive one in June, and filed it on June 6, 2009.

The CCDC Defendants argue that Pullano failed to request medical exercise during his detention. They also argue that the medical unit housing does not have the capacity for exercise, and that valid penological reasons exist for not providing medical inmates exercise.

Exercise is a "basic human need," the deprivation of which can sustain an Eighth Amendment violation. *See Allen*, 48 F.3d at 1088. "For over thirty years, [the Ninth Circuit has] emphasized that "some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." *Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010) (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)).

Prison officials intentionally deprived Pullano of exercise. This fact is not in dispute. The subjective element requires that the officials were deliberately indifferent to Pullano's need for exercise. "To establish a prison official's deliberate indifference, an inmate must show that the official was aware of a risk to the inmate's health or safety and that the official deliberately disregarded the risk." *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009). The CCDC Defendants were made aware, at or near booking, of

Pullano's serious medical conditions. They were made aware specifically of Pullano's requests for exercise as late as June 6, 2009, and as early as the beginning of May 2009. For this reason, Pullano has made the required subjective showing that Defendant Wolfe was deliberately indifferent to Pullano's need for exercise. No genuine issue of material fact exists on this requirement.

Notwithstanding Pullano's serious medical conditions and his requests for exercise, the CCDC Defendants intentionally withheld exercise to all medical unit inmates. In their Response and Counter-Motion, they cite "penological interests" and argue that exercise "is not a safe and orderly function in an infirmary setting." The CCDC Defendants can have no excuse for denying medical patients — particularly those, like Pullano, whose serious medical conditions were known to prison officials — the right to exercise while in detention. *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (holding that six and one-half week deprivation of outdoor exercise violated Eighth Amendment); *Adams v. Wolff*, 624 F. Supp. 1036, 1039-40 (D. Nev. 1985) (affirming damages award for nearly six weeks' deprivation of outdoor exercise). Of course, an inmate's right to exercise is not "absolute or indefeasible," *see Norwood v. Vance*, 591 F.3d 1062, 1069 (9th Cir. 2009), and the need for maintaining the safety of inmates, for example, tempers this right, *see id.* Here, however, the CCDC Defendants have made no showing that Pullano's right to exercise should be curtailed for safety concerns. Mere recitation of a conclusory penological interest does not undo Defendants' violation of Pullano's right to outdoor exercise, particularly in light of his serious medical conditions that the CCDC Defendants were aware of.[10] This ruling is not meant to foreclose the possibility that such an interest might exist; prison officials

---

[10]This is particularly true in light of the evidence in the record, from the affidavit of inmate Kevin Davis, that CCDC medical housing inmates had previously had access to the adjacent exercise yard, but that those privileges were taken away from them because of inappropriate contact with the nearby women's unit that shared the same yard. (*See* dkt. no. 95-W.1.) The CCDC Defendants do not contest this fact. That outdoor exercise was previously available to medical inmates undermines the CCDC Defendants' position that exercise is not a "safe and orderly function in an infirmary setting."

may be able to demonstrate a legitimate penological interest in preventing inmates housed in medical infirmaries from exercising outdoors. But the Defendants here have not met their burden of demonstrating such an interest in this case. As a result, Pullano has satisfied his burden of demonstrating that no genuine issue of material fact exists as to the objective element of an Eighth Amendment conditions of confinement claim.

### 3. Lighting, Seating, Electrical Hazard claims

In addition to the withholding of exercise, Pullano's Complaint alleges Eighth Amendment violations arising out of exposure to unsafe and inhumane conditions, including lack of adequate lighting, forced standing, uncouth medical procedures, and electrical hazards. Pullano's Motion for Partial Summary Judgment sought summary judgment on the claim related to access to exercise, but not on Counts VI on VII relating to these other conditions. These Counts have not been dismissed, and are pending against the CCDC Defendants. The CCDC Defendants filed their Counter-Motion for Summary Judgment seeking summary judgment on all conditions of confinement claims. In his Response, Pullano did not address these remaining conditions of confinement claims.

The CCDC Defendants argue that no Eighth Amendment violation occurred because these complaints, assuming they are true, do not rise to the level of constitutional violations, no deliberate indifference to Pullano's housing and living needs can be demonstrated, and that Pullano does not allege any harm resulting from these conditions. Upon making a showing, as done here, that the nonmoving party does not have enough evidence of an essential element to carry out its burden of persuasion, the non-moving party must set forth specific facts showing there is a genuine issue for trial. *See Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102; *Anderson*, 447 U.S. at 256. Pullano failed to respond to this portion of the CCDC Defendant's Motion, and failed to proffer evidence showing a genuine issue of material fact on these non-exercise claims. As a result, the CCDC Defendants' Motion is granted with respect to these claims. *See*

1    *also* Local Rule 7-2(d) ("The Failure of an opposing party to file points and authorities in

2    response to any motion shall constitute a consent to the granting of the motion.").

3            **D.      First Amendment Retaliation Claim**

4            The CCDC Defendants appear to seek summary judgment on Pullano's First

5    Amendment claims, but those claims were dismissed per the Court's July 8, 2011,

6    Order.  This portion of the CCDC Defendants' Counter-Motion is thus denied as moot.

7            **E.      Discourteous Conduct**

8            The CCDC Defendants appear to seek summary judgment on purported claims of

9    constitutional violations arising out of discourteous conduct CCDC officials aimed toward

10   other inmates.  However, Pullano does not allege constitutional violations based solely

11   on prison staff's discourteous conduct toward him.   For this reason, the CCDC

12   Defendants' Counter-Motion on this issue is also denied as moot.

13           **F.      Municipal Liability Claims**

14           Lastly, the CCPD Defendants seek summary judgment on behalf of the Las

15   Vegas Metropolitan Police Department ("LVMPD") on the grounds that Pullano has not

16   demonstrated that the individual defendants were acting under a custom or policy of the

17   police department itself.   For that reason, they seek dismissal of Pullano's municipal

18   liability cause of action.

19           For the same reason that the CCPD Defendants' Motion is granted with respect to

20   the non-exercise conditions of confinement claims, their Motion is granted here with

21   respect to any causes of action against LVMPD.  Pullano did not respond to this portion

22   of the CCPD Defendants' Motion and failed to proffer evidence of a custom or policy to

23   create a triable issue of fact.

24   **IV.    CONCLUSION**

25           Accordingly, IT IS HEREBY ORDERED THAT  Plaintiff    Francis    J.    Pullano's

26   Motion for Partial Summary Judgment (dkt. no. 95) is GRANTED IN PART and DENIED

27   IN PART.

28   ///

1         IT IS FURTHER ORDERED THAT Defendants Clark County Detention Center,

2   Sheriff Gillespie, Former Deputy Chief Kirkegard, Officer Arb, Officer Wesley, Officer

3   Wolfe, and Officer Escobar's Motion for Summary Judgment (dkt. no. 96) is GRANTED

4   IN PART and DENIED IN PART.

5         IT IS FURTHER ORDERED THAT Defendants Judy Frank, Elias S. Nolasco, Joe

6   Venturina, and Nancy Goodman's Counter-Motion for Summary Judgment (dkt. no. 122)

7   is GRANTED.

8

9         Dated this 27th day of September 2012.

10

11                                           _____

12                       UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28